[Cite as *In re C.W.*, 2024-Ohio-4987.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: C.W. | : | APPEAL NO. C-240383 |
| | | TRIAL NO. F20-1221X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 16, 2024

*Christopher P. Kapsal*, for Appellant Mother,

*ProKids* and *Jeffrey A. McCormick,* for Appellee Guardian Ad Litem,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services.

**CROUSE, Judge.**

**{¶1}** Appellant mother appeals from the trial court's judgment overruling her objections to the magistrate's decision and adopting the magistrate's decision granting permanent custody of her child C.W. to appellee the Hamilton County Department of Job and Family Services ("HCJFS").

**{¶2}** Mother raises two assignments of error for our review. In her first assignment of error, she challenges the trial court's failure to grant her a continuance or to make other arrangements for her remote appearance at the final hearing on HCJFS's motion for permanent custody. In her second assignment of error, mother argues that the trial court's decision granting permanent custody of C.W. to HCJFS was not supported by sufficient evidence and was against the manifest weight of the evidence. Finding mother's arguments to be without merit, we affirm the trial court's judgment.

## I. Factual and Procedural Background

**{¶3}** C.W. was born on June 24, 2020. On December 9, 2020, HCJFS filed a motion for an interim order of temporary custody of C.W. and a complaint for temporary custody. The complaint alleged that C.W., then five-and-a-half months old, was neglected and dependent. With respect to C.W.'s father, the complaint alleged that father was charged with telecommunications harassment and domestic violence against mother, but that the charges were dismissed when mother failed to appear in court, and that father is currently serving a 15-month sentence on drug charges.

**{¶4}** With respect to mother, the complaint alleged that she was caught stealing from a convenience store on September 8, 2020, while C.W. was in her care, that she was combative when stopped for this incident, and that she was charged with

multiple related offenses and ultimately pled guilty to resisting arrest, theft, and assault on an officer. The complaint further alleged that a safety plan was implemented for C.W. when mother was arrested, that mother has a lengthy criminal record, and that she has been diagnosed with "Other Specified Personality Disorder with Antisocial Features" and with "Alcohol Use Disorder."

{¶5} The complaint for temporary custody was amended to include an allegation that during a home visit by a caseworker on November 12, 2020, mother became physically and verbally aggressive with the caseworker. After locking the caseworker in her apartment and throwing his phone out of a window, mother spit on him and sprayed him with an unknown chemical substance when he attempted to flee from the apartment.

{¶6} On December 10, 2020, a juvenile court magistrate conducted a hearing and granted HCJFS's motion for an interim order of temporary custody. A case plan was developed for the family providing that mother would need to follow all recommendations from her psychological assessment, engage in substance-use and mental-health services, and complete random drug screens. The case plan indicated that mother was diagnosed with "Other Specified Personality Disorder with Antisocial Features" and "Alcohol Use Disorder."

{¶7} Following an adjudication hearing on April 27, 2021, C.W. was adjudicated dependent. The allegation of neglect was dismissed. On August 3, 2021, the magistrate issued a decision committing C.W. to the temporary custody of HCJFS.

{¶8} On October 13, 2021, HCJFS filed a motion to extend temporary custody. The motion stated that progress had been made on the case plan with respect to mother, who had engaged in facilitated visits, parenting classes, and counseling,

and had obtained housing and employment. The motion stated that father remained incarcerated and was not participating in services.

{¶9} An expedited hearing was held in January of 2022, after mother threatened to assault her attorney. On January 14, 2022, the magistrate issued both an order allowing mother's attorney to withdraw and a decision granting the motion for an extension of temporary custody of C.W. Mother subsequently obtained new counsel.

{¶10} On April 14, 2022, HCJFS filed a motion for a second extension of temporary custody. This motion stated that despite having been previously discharged from the Family Nurturing Center ("FNC") for inconsistent visitation, mother was currently engaged in facilitated visits at the FNC and counseling. The motion further stated that HCJFS had no concerns about mother's behavior during visits or her interaction with C.W. but noted that mother continued to incur violent criminal charges despite engaging in services.

{¶11} On May 4, 2022, HCJFS filed a motion to terminate temporary custody and award legal custody of C.W. to M.S., his maternal great-grandmother.

{¶12} On May 11, 2022, the magistrate granted HCJFS's motion for a second extension of temporary custody.

{¶13} On November 3, 2022, HCJFS filed a motion to modify temporary custody to permanent custody. The motion argued that C.W. had been in agency custody for 12 or more months of a consecutive 22-month period and that a grant of permanent custody was in the best interest of C.W.

{¶14} A hearing was held on the motion for permanent custody on April 10, 2023, and June 26, 2023. At the June hearing, father voluntarily surrendered his

4

parental rights on the record and expressed that he would like C.W. to be placed with M.S.

{¶15} The hearing was continued in progress until September 25, 2023. However, because mother was incarcerated on that date, her counsel requested a continuance. The request was granted, and the case was continued until November 13, 2023. On that date, mother remained incarcerated, and her counsel requested another continuance. The magistrate denied the request and proceeded with the hearing.

{¶16} The evidence presented at the permanent-custody hearing established that C.W. had been in the care of M.S. since December of 2020. Prior to caring for C.W., M.S. raised her own nine children and helped care for her 22 grandchildren. Although she was 82 years old at the time of testifying, M.S. believed that she was physically able to care for C.W. and wanted to adopt him. C.W. is bonded not only to M.S., but to his other extended family members as well. He has a routine at home with M.S. and is a happy child.

{¶17} M.S. enrolled C.W. at the Young Child Institute for mental-health-related treatment after noticing that he pulled hair out of his head and often woke at night screaming. The Institute provided M.S. with tools to utilize when C.W. has an outburst, and C.W.'s speech and behavior have improved since his enrollment.

{¶18} Extensive testimony was presented concerning mother's visitation with C.W. Mother's visitation initially took place at M.S.'s home but was later moved to the FNC. The record contains conflicting testimony as to the reason for the location change. M.S. explained that visitation was moved following an "altercation." According to mother, this altercation occurred when her extended family "ganged up" on her when she attempted to break up a fight between her father and a cousin.

5

However, mother's aunt testified that visitation was moved to the FNC after mother disappeared for a lengthy period with a family member's car. When mother returned with the car, she appeared to be under the influence and engaged in an argument with her father. In an attempt to diffuse the situation, aunt drove mother and C.W. to aunt's home. After mother and aunt argued in the parking lot, mother walked away with C.W., prompting aunt to call the police.

{¶19} The record contains no evidence of problematic interactions between mother and C.W. during visitation. However, mother's visitation was inconsistent due to her repeated incarceration, resulting in periods in which she was removed from the visitation schedule at the FNC. Mother attributed her missed visits not only to her incarceration, but also to transportation issues and a period of hospitalization. She acknowledged that she was twice removed from FNC's visitation schedule because of attendance issues, and she agreed that between May and October of 2022, there was a 90-day period in which she did not attend visitation. Mother never progressed past the supervised level of visitation. She attributed this failure in progression to her frequent arrests, testifying that she was told that home visits would not occur until she was able to avoid incurring criminal charges for a six-month period.

{¶20} Testimony was presented concerning the other services that mother received. On her own initiative, mother sought a referral and engaged in parenting classes. She first participated in a parenting class through Beech Acres. Despite records indicating that she was discharged as unsuccessful, mother maintained that she successfully completed the class. She denied having been discharged for incurring a criminal charge, and she posited that the discharge was labeled unsuccessful due to her failure to complete an end-of-class survey. Mother also participated in parenting

6

classes through Justice Works. According to mother, she successfully completed this program and continues to reach out to her instructor.

{¶21} An HCJFS supervisor that testified did not share mother's opinion regarding mother's successful completion of parenting classes. The supervisor explained that the agency made three referrals for mother to take parenting classes, but that mother was consistently unable to complete the classes due to her incarceration.

{¶22} Mother completed both a diagnostic assessment and a psychological assessment. As a result of these tests, Mother was asked to submit to random drug screens. Mother complied with the drug screens. While she has tested positive for marijuana, the record establishes that she received a medical marijuana card during the pendency of this case. According to mother, she obtained the medical marijuana card because she suffered from post-traumatic stress disorder after being shot several years earlier. Mother denied struggling with alcohol abuse, and she noted that alcohol had not shown up on any of her screens.

{¶23} Mother engaged in therapy with Greater Cincinnati Behavioral Health, although she was unable to complete the therapy because of her incarceration. Mother completed anger-management classes, but her aggression remained a concern for C.W.'s guardian ad litem ("GAL"). The GAL referenced in her testimony mother's threat to harm her previous counsel, as well as an incident in which mother cursed at the GAL after a court hearing and followed the GAL to the elevator.

{¶24} Housing was an issue for mother throughout this case. The record establishes that during the pendency of these proceedings, mother stayed with a friend, with father's mother, in a shelter, and in a hotel in Dayton before securing

7

housing in Middletown. However, mother's future housing is unknown due to her incarceration.

**{¶25}** A major concern in this case, which was addressed extensively in the testimony from various witnesses, was mother's criminal history and incarceration. Mother was arrested approximately 12 times since HCJFS filed its first complaint for custody of C.W. in December of 2020. On the date of the last permanent-custody hearing, mother was incarcerated in Warren County on an 18-month sentence, and she faced pending felonious-assault charges in Hamilton County upon her release.

**{¶26}** Both the GAL and the HCJFS supervisor felt that a grant of permanent custody was in the best interest of C.W. While the GAL believed that mother was trying to improve herself, she was concerned about mother's criminal history, continued periods of incarceration, and aggression. The HCJFS supervisor explained that the agency was not looking solely at mother's participation in services, but for actual behavior changes, and she expressed concern over mother's impulsivity and lack of insight into C.W.'s needs.

**{¶27}** On December 27, 2023, the magistrate issued a decision committing C.W. to the permanent custody of HCJFS. Mother filed an objection to the magistrate's decision contending that "HCJFS failed to demonstrate by clear and convincing evidence that permanent custody is [in] the best interest of the child, and the award of permanent custody was against the manifest weight of the evidence." The objection further stated that mother was currently incarcerated and was not receiving legal mail, and that counsel was filing it to preserve mother's rights.

{¶28}  On June 17, 2024, the trial court issued an entry overruling mother's objections and adopting the magistrate's decision committing C.W. to the permanent custody of HCJFS. Mother now appeals.

## II. No Error in Denial of Continuance

{¶29}  In her first assignment of error, mother argues that the trial court erred in not granting a continuance for her appearance on the date of the final permanent-custody hearing, or alternatively in not making other arrangements for her remote appearance.

{¶30}  Mother did not challenge the magistrate's denial of her request for a continuance in her objections to the magistrate's decision. "An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection." Juv.R. 40(D)(3)(b)(ii). Because Mother failed to raise this issue in her objections, she has waived her right to contest all but plain error. Juv.R. 40(D)(3)(b)(iv); *In re J.W. and H.W.*, 2019-Ohio-2730, ¶ 7 (1st Dist.).

{¶31}  In the civil context, plain error is generally disfavored. *In re M.H. and B.H.*, 2024-Ohio-1548, ¶ 11 (1st Dist.). It should only be applied in a situation in which an unobjected-to error was made, and where the basic fairness, integrity or public reputation of the judicial system has been seriously affected by the error. *In re J.W.* at ¶ 7.

{¶32}  Mother appeared on the first two dates of the permanent-custody trial. At the close of the hearing in June of 2023, the case was continued in progress until September 25, 2023. Mother filed a motion for a continuance prior to that date, requesting a continuance because she was currently incarcerated and would be incarcerated on the scheduled court date. Mother's motion was granted, and the

9

hearing was continued until November 13, 2023. Mother remained incarcerated on that date. Her counsel appeared at the hearing and requested another continuance. Counsel made the following statements in support of the request for a continuance:

> [Mother] is not present today. Obviously she is currently incarcerated at the Warren County Detention Center. She has received an 18-month sentence to the Ohio Department of Corrections, two nine-month consecutive sentences.
>
> I spoke with her towards the end of last week by telephone from the correction center, she advised me that she believes that the judge told her—the judge that sentenced her in Warren County told her that he would bring her back in front of him after about 60 days to see if he would consider putting her in some kind of program.
>
> So I told her based on that that I would ask for a continuance, another continuance. I'm aware that at our last setting the Court gave me a continuance because she was incarcerated then.
>
> But I would do my best to ask for one more continuance so that she can be present in person. I also did give her your Zoom number and password so that she was going to see—I know that I had contacted your staff to see if it was possible to make her available on Zoom, and that we are not able to bring her back from Warren County Correctional Facility, I guess outside of Hamilton County.
>
> So she was going to see if she could call in and attend by telephone, but we didn't know if that could happen, and apparently it wasn't able to happen, so I would ask the Court for a continuance.

10

**{¶33}** HCJFS objected to the requested continuance, noting that mother was currently serving an 18-month sentence and there was no guarantee that she would be released and placed into another program in 60 days. HCJFS further noted that mother faced a pending felonious-assault charge in Hamilton County, and it stressed the impact that mother's repeated incarceration has had on the case.

**{¶34}** The magistrate denied mother's request for a continuance. He noted that one continuance had already been granted, that the permanent-custody trial had been in progress since April of that year, and that C.W. deserved a permanent placement. Mother's counsel then actively participated in the hearing and cross-examined all witnesses presented by HCJFS.

**{¶35}** We addressed a similar argument regarding the denial of a continuance when a parent was incarcerated in *In re J.W.*, 2019-Ohio-2730 (1st Dist.). In *J.W.*, mother's counsel requested that a permanent-custody hearing be continued because mother was incarcerated. *Id.* at ¶ 3. The motion was denied, and the hearing proceeded in mother's absence, although counsel for mother was present and continued to represent her. *Id.* at ¶ 4. Mother's parental rights were ultimately terminated, and she argued on appeal that her due-process rights were violated by the denial of her requested continuance because she was denied an opportunity to meaningfully participate in the permanent-custody hearing. *Id.* at ¶ 5 and 7.

**{¶36}** This court held that it was limited to reviewing for plain error because mother failed to object to the denial of the continuance in her objections to the magistrate's decision. *Id.* at ¶ 7. After acknowledging that a parent's right to due process in parental-termination proceedings included an opportunity to be heard before parental rights were terminated, we explained that an incarcerated parent's

11

due-process rights would still be protected where "'the [incarcerated] parent is represented by counsel at the hearing, a full record of the proceedings is made, and any testimony that the parent may wish to present could be offered by way of deposition.'" (Bracketed text in original.) *Id.* at ¶ 8, quoting *In re P.J. and D.M.*, 2009-Ohio-182, ¶ 66 (11th Dist.).

**{¶37}** We found no due-process violation in *J.W.* because mother was represented by counsel in her absence, and the record indicated that counsel's performance was both active and adequate. *Id.* at ¶ 9. We further stated that mother had made "no showing as to either being prevented from submitting deposition testimony, or as to why she was unable to secure some type of testimony in light of her incarceration. Counsel knew about this predicament almost a month before the hearing and failed to utilize some alternative vehicle to present Mother's testimony to the court." *Id.*

**{¶38}** The same reasoning holds true in the case at bar. Counsel knew that mother would be incarcerated on the date of the hearing and could have made other arrangements to secure mother's testimony. Mother has made no showing as to why she was unable to utilize an alternate means of presenting testimony, for example by way of deposition.

**{¶39}** Mother argues that the magistrate should have arranged for her to appear remotely. The facts and circumstances of this case render mother's argument somewhat insincere. The record contains no indication that mother filed a request for a continuance ahead of time. Rather, her counsel appeared at the hearing and requested that it be continued. And while counsel made a vague statement at the

hearing that he had asked court staff to see if was possible for mother to appear remotely, the record contains no formal request for mother to appear remotely.

{¶40} Although mother did not appear at the hearing, her counsel actively participated on her behalf. And as the magistrate noted when denying the continuance, the permanent-custody hearing had been in progress since April of that year. At the time of the November hearing, C.W. had been in the care of HCJFS for almost three years and was in need of a permanent placement and resolution of his custodial status. Further, the magistrate had already granted mother one continuance due to her incarceration, and the magistrate's statements when denying mother's continuance reflect the magistrate's attempts to balance the interests of all involved.

{¶41} On this record, we find no plain error in the denial of mother's requested continuance. The first assignment of error is overruled.

### III. Sufficiency and Weight of the Evidence

{¶42} In her second assignment of error, mother argues that the trial court erred in finding that permanent custody was in the best interest of C.W. when that finding was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶43} R.C. 2151.414, the applicable statute, was amended effective April 3, 2023. Only minor changes were made in this amendment. *In re P., S., and M. Children*, 2024-Ohio-2794, ¶ 17 (1st Dist.). We must apply the version of this statute that was in effect at the time that the motion for permanent custody was filed. *Id.* Accordingly, we will apply the former version of the statute that was in effect on November 3, 2022, the date of the relevant filing.

**{¶44}** Pursuant to former R.C. 2151.414(B), a trial court may grant permanent custody of a child to a children services agency if the court determines that a grant of permanent custody is in the best interest of the child and that one of the five conditions set forth in R.C. 2151.414(B)(1) applies. *In re A.Y.C. and E.Y.C.*, 2023-Ohio-4494, ¶ 32 (1st Dist.).

**{¶45}** With respect to a finding that permanent custody is in the best interest of a child, that finding can be either discretionary or mandatory. Former R.C. 2151.414(D)(1) and (2). As we have explained, "[f]ormer R.C. 2151.414(D)(1) and 2151.414(D)(2) were 'alternative means for reaching the best-interest determination.'" *In re P., S., and M. Children* at ¶ 19, quoting *In re J.P.*, 2019-Ohio-1619, ¶ 40 (10th Dist.). "Former R.C. 2151.414(D)(2) set forth a list of circumstances that, if all were found to exist, mandated a finding that permanent custody was in the best interest of the child." *Id.* at ¶ 20. In contrast, under former R.C. 2151.414(D)(1), the juvenile court was required to weigh multiple factors "to decide whether granting an agency permanent custody of a child is in that child's best interest." *In re J.P.* at ¶ 39.

**{¶46}** Regardless of whether a trial court relies on former R.C. 2151.414(D)(1) or (2), the court's findings must be supported by clear and convincing evidence. Former R.C. 2151.414(B)(1). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

14

{¶47} In reviewing a challenge to the sufficiency of the evidence supporting a grant of permanent custody, the role of this court is to independently review the evidence to determine if the trial court's decision is supported by clear and convincing evidence. *In re S.D., R.D., J.D. and M.D.*, 2020-Ohio-3379, ¶ 12 (1st Dist.); *In re A.Y.C.*, 2023-Ohio-4494, at ¶ 34 (1st Dist.). The evidence supporting each permanent-custody finding must satisfy the clear-and-convincing standard. *In re S.D.* at ¶ 12. In our review, we must accept factual determinations made by the trial court in support of the permanent-custody findings if they are supported by competent and credible evidence. *In re A.Y.C.* at ¶ 34.

{¶48} In contrast, when reviewing a challenge to the manifest weight of the evidence, "'we review the record to determine whether the trial court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed.'" *Id.*, quoting *In re B.J.*, 2021-Ohio-373, ¶ 14 (1st Dist.).

{¶49} In this case, the trial court found that a grant of permanent custody to HCJFS was in C.W.'s best interest and that C.W. had been in agency custody for 12 or more months of a consecutive 22-month period under former R.C. 2151.414(B)(1)(d). Mother concedes that this latter finding was correct and does not challenge it on appeal.

{¶50} With respect to the trial court's best-interest finding, it determined that a grant of permanent custody was in the best interest of C.W. under *both* former R.C. 2151.414(D)(1) and (2). It is not necessary for a trial court to make both a discretionary and a mandatory best-interest determination. Because the magistrate's grant of permanent custody, which the trial court adopted, was based on a discretionary best-

interest finding, and because the parties argue on appeal the factors set forth in former R.C.2151.414(D)(1), we will review the trial court's best-interest determination under that section of the statute.

{¶51} Former R.C. 2151.414(D)(1)(a) requires the trial court to consider the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child. In support of this factor, the trial court found that C.W. was bonded to M.S. and his other family members, that M.S. was interested in adoption, and that M.S. intended to ensure that C.W. remembered mother.

{¶52} Clear and convincing evidence supported the trial court's finding regarding C.W.'s bond with M.S. C.W. has been placed with M.S. since December of 2020, and he is thriving in her care. M.S. enrolled C.W. in the Young Child Institute, which has greatly improved his behavioral problems. Mother argues that M.S. is too old to properly care for C.W. Although M.S. is 82 years old, the record contains no indication that M.S. suffers from any health problems or that her age in any way hinders her ability to care for C.W. M.S. also has extensive support from her family members, who have bonded with C.W.

{¶53} Mother additionally argues that the trial court failed to consider mother's relationship with C.W. when discussing this factor. The evidence in the record establishes that mother clearly loved C.W., but that mother's mental-health and aggression issues resulted in her repeated incarceration and impeded her ability to care for and bond with C.W. Mother's relationship and interactions with C.W. were severely limited because of her incarceration. While there is no indication that mother behaved inappropriately on her visits, and by all indications the visits were positive,

she was removed from the visitation schedule several times due to missed visits. And mother was never able to move past the supervised level of visitation due to her incarceration and inconsistency in visiting.

{¶54} Former R.C. 2151.414(D)(1)(b) required the trial court to consider the wishes of the child, as expressed directly through the child or through the child's guardian ad litem. The trial court found that three-year-old C.W. was unable to understand the significance of permanent custody, but that his GAL was in favor of a grant of permanent custody to HCJFS. These findings were supported by clear and convincing evidence.

{¶55} Next, former R.C. 2151.414(D)(1)(c) required the trial court to consider the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period. The trial court found that this condition was satisfied, and, as stated above, mother does not dispute this finding. Our review of the record leads us to conclude that it is correct.

{¶56} In determining the length of time that a child has been in agency custody, the child will be considered to have entered agency custody on either the date that the child was adjudicated or 60 days after the child was removed from home, whichever is earlier. Former R.C. 2151.414(B)(1)(e). The 12-month period must have been satisfied at the time that the agency filed the motion for permanent custody. *In re P. and H. Children*, 2019-Ohio-3637, ¶ 11 (1st Dist.).

{¶57} Here, C.W. was adjudicated dependent on April 27, 2021. And because he was removed from his home on December 10, 2020, 60 days after his removal was February 8, 2021. As this latter date is earlier, it will be used to determine whether the

12-of-22 condition has been satisfied. At the time that the motion for permanent custody was filed on November 3, 2022, C.W. had been in agency custody for approximately 21 months. The trial court's finding under this factor was supported by clear and convincing evidence.

{¶58} Turning to former R.C. 2151.414(D)(1)(d), the trial court was required to consider C.W.'s need for a legally secure placement and whether that type of placement could be achieved absent a grant of permanent custody. In support of this factor, the trial court noted that HCJFS had initially filed a motion to award legal custody to M.S. The trial court found that legal placement with M.S., instead of permanent custody, was not a viable option for C.W. due to concerns that mother would later seek to establish visitation or custody. The court further found that, given the amount of time that the case had been pending, C.W. deserved stability. These findings were supported by clear and convincing evidence.

{¶59} Mother argues that the trial court failed to consider that a legally secure placement could be achieved by returning C.W. to her care. Mother's argument minimizes both the amount of time that she spent incarcerated and the impact of her incarceration on C.W. Mother further contends that she made significant progress in her case plan. But while mother did participate in services, the evidence in the record establishes that she continued to engage in impulsive and aggressive behaviors, as evidenced by the fact that she continued to incur charges and her repeated incarceration.

{¶60} Last, former R.C. 2151.414(D)(1)(e) required the trial court to consider whether any of the factors in former R.C. 2151.414(E)(7) to (11) applied. The trial court found that the factor in (E)(10) applied. Former R.C. 2151.414(E)(10) provided that

18

"[t]he parent has abandoned the child." In support of this finding, the trial court noted that mother had twice been removed from visitation at the FNC due to issues with her inconsistent attendance, and that there was a 90-day period from May to October of 2022 in which mother failed to visit C.W. The court stated that it believed that mother tried to visit with C.W. to the best of her ability, but that the period of time in which she missed visitation nonetheless constituted abandonment. This finding was supported by clear and convincing evidence. Mother conceded when testifying that a period of more than 90 days passed without her visiting C.W. This constituted abandonment. *See* R.C. 2151.011(C) ("a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days").

{¶61} Following our review of the record, we hold that the trial court's findings in support of its grant of permanent custody were supported by clear and convincing evidence. *See In re S.D.*, 2020-Ohio-3379, at ¶ 12 (1st Dist.); *In re A.Y.C.*, 2023-Ohio-4494, at ¶ 34 (1st Dist.). We further hold that the trial court's judgment was not against the manifest weight of the evidence. Given mother's anger-management issues and continued periods of incarceration, as well as the resulting impact of her incarceration on her ability to visit with C.W. and participate in services, this was not the rare case in which the trier of fact lost its way and committed a manifest miscarriage of justice such that its judgment must be reversed. *See In re A.Y.C.* at ¶ 34.

{¶62} Mother's second assignment of error is overruled, and the trial court's judgment awarding permanent custody of C.W. to HCJFS is affirmed.

Judgment affirmed.

**BERGERON, P.J.,** and **WINKLER, J.,** concur.

Please note:

      The court has recorded its entry on the date of the release of this opinion.