[Cite as *In re D.S.*, 2016-Ohio-7761.]

STATE OF OHIO        )             IN THE COURT OF APPEALS
                      )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT     )

IN RE: D.S.                            C.A. No.      28252

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 14-05-335

DECISION AND JOURNAL ENTRY

Dated: November 16, 2016

CARR, Presiding Judge.

{¶1} Appellant, D'Wayne S. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor child and placed the child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Father is the biological father of D.S., born June 1, 2011. The child's mother stopped working on the case plan and moved to Kansas during this case, did not participate in the permanent custody hearing, and did not appeal from the trial court's judgment.

{¶3} CSB has an extensive history with D.S. and his parents, which has continued to involve concerns about both parents' unstable mental health and substance abuse, domestic violence perpetrated by Father, and the family's lack of stable housing. Shortly after D.S. was born, the parents placed him with his maternal grandparents while they worked on a voluntary

case plan with CSB. D.S. resided with his grandparents for approximately six months and then returned to his parents' home.

{¶4} D.S. lived with his parents for several months until the parents again began having drug problems. They agreed to return D.S. to the temporary custody of the maternal grandparents while they worked on another reunification case plan.

{¶5} During the second voluntary case, D.S. lived with his grandparents until the end of 2012. At that time, without informing CSB, the grandparents returned D.S. to his parents because they thought that the parents had completed the requirements of the voluntary case plan. According to CSB, however, it closed the voluntary case because it believed that the grandparents intended to seek legal custody of D.S.

{¶6} On January 2, 2013, shortly after returning D.S. to his parents, the grandparents did file a complaint for legal custody. They alleged that both parents continued to abuse drugs in the presence of the child. Following an emergency hearing that the parents did not attend, the juvenile court granted the grandparents emergency temporary custody of D.S. At the time of the status hearing one month later, the parents still were not consistently engaging in mental health and substance abuse treatment and both were homeless.

{¶7} During April 2013, the grandparents dismissed their complaint for legal custody and asked the court to return D.S. to the custody of his mother. One day before the trial court dismissed their complaint and returned D.S. to his mother's legal custody, CSB filed a complaint to allege that he was a dependent child and sought an order of protective supervision. The juvenile court later adjudicated D.S. a dependent child, placed him under the protective supervision of CSB, and ordered the parents to comply with a reunification case plan, which

again focused on their mental health and substance abuse problems. On November 15, 2013, the trial court terminated the order of protective supervision and closed that case.

{¶8} Three months later, CSB began another voluntary case with the family because Father was using excessive physical discipline on then two-year-old D.S. The agency's voluntary involvement did not resolve that problem, as Father's use of excessive discipline continued to escalate. On May 20, 2014, Akron Police removed D.S. from his parents' custody because Father had slapped him and caused significant bruising to the right side of the child's face.

{¶9} The next day, CSB filed the complaint to commence this case, alleging that D.S. was an abused, neglected, and dependent child. It also sought and obtained an order to place the child in the emergency temporary custody of the maternal grandmother. The juvenile court later adjudicated D.S. an abused and dependent child and placed him in the temporary custody of the maternal grandparents under an order of protective supervision by CSB. Father was eventually convicted of child endangering for causing the child's injuries and was placed on community control.

{¶10} During December 2014, the grandparents informed CSB that they could not provide a long-term home for D.S. because of their advanced ages. D.S. was moved to two different kinship homes and ultimately was placed in a foster home, where he remained throughout the remainder of the case.

{¶11} The case plan in this case again required Father to address his mental health and substance abuse problems and to resolve his criminal matters with his probation officer. As in the past, however, Father failed to consistently work on the reunification goals of the case plan.

{¶12} Father has struggled with mental illness for the past twenty years and has not been consistent in receiving treatment. He has been diagnosed with schizoaffective disorder and intermittent explosive disorder. One of his mental health professionals described some of the symptoms of his two mental health diagnoses. Father's schizoaffective disorder, if untreated, causes him to experience hallucinations, delusions, and other psychotic symptoms. Father admitted that he had experienced hallucinations off and on for many years because he did not consistently take his prescribed psychiatric medications.

{¶13} The expert described Father's intermittent explosive disorder as a mental illness characterized by outbursts of yelling, physical violence, and other anger-driven behavior. Father has a long history of perpetrating violence against others, including D.S. and the child's mother. He also has a long history of drug and alcohol abuse, which further compounds his ability to control his violent behavior. Six months into this case, the mother called the caseworker to report that Father had been drinking and became violent and threatening toward her. Although the caseworker told the mother to call the police, she did not.

{¶14} To address his domestic violence problems, the case plan required Father to engage in anger management programs in conjunction with his mental health and substance abuse treatment. Father completed some anger management programs but did not consistently engage in mental health or substance abuse treatment. Moreover, Father continued to exhibit threatening behavior toward others. Although Father once admitted to the caseworker that he needed to abstain from drugs and alcohol to control his anger, he continued to minimize his substance abuse problem and often refused to submit to required drug and alcohol testing or, when he did, sometimes tested positive for drugs or alcohol.

{¶15} CSB eventually moved for permanent custody of D.S. and Father alternately requested legal custody of him. Following a hearing, the trial court terminated parental rights and placed D.S. in the permanent custody of CSB. Father appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT TERMINATED MOTHER'S AND FATHER'S PARENTAL RIGHTS RATHER THAN GRANTING LEGAL CUSTODY TO FATHER.

{¶16} Father's sole assignment of error is that the trial court erred in terminating his parental rights. Before a juvenile court may terminate parental rights and award permanent custody of children to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the children are abandoned; orphaned; have been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; they or another child in a parent's custody have been adjudicated abused, neglected, or dependent on three separate occasions; or they cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the children, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996). The trial court found that CSB satisfied the first prong of the permanent custody test because the children had been in the temporary custody of CSB for more than 12 of the prior 22 months.

{¶17} Father does not dispute that finding but instead challenges the trial court's conclusion that permanent custody was in the best interests of the children. Father focuses his

argument almost exclusively on evidence pertaining to whether he complied with the goals of the case plan. To begin with, although a parent's case plan compliance may be relevant to the best interest of the child, it is not dispositive. *See, e.g*., *In re K.C.*, 9th Dist. Summit Nos. 26992, 26993, 2014-Ohio-372, ¶ 22; *In re B.G.,* 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 21. Moreover, as explained already, the evidence before the trial court demonstrated that Father had not remedied all of the problems that caused D.S. to be placed outside of his parents' custody for most of the child's life.

{¶18} When determining the child's best interests under R.C. 2151.414(D), the juvenile court must consider all relevant factors, including the interaction and interrelationships of the child, his wishes, the custodial history of the child, and his need for permanence in his life. *See In re R.G.,* 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Although the trial court is also required to consider any relevant factors under R.C. 2151.414(E)(7) through (11), none of those factors applied to the facts of this case. *See id*.

{¶19} Father's interaction with D.S. throughout this case was limited to supervised visitation. Father attended 26 of the 39 visits that were scheduled while D.S. resided in Summit County. Father stated that he missed many of those visits because he has chronic back pain that sometimes confines him to bed. Witnesses observed little interaction between Father and D.S. and noted that Father could not supervise him without assistance. For example, Father was unable to prevent D.S. from running out of the room and was unable to catch him when he did.

{¶20} Moreover, during this case D.S. was diagnosed with Type I Diabetes, which required continual monitoring of his blood sugar levels, medication, and diet. The trial court heard testimony that it was critical for a caregiver to appropriately monitor and adjust D.S.'s blood sugar levels because his diabetes is potentially life threatening. His caregivers must know

how to monitor and adjust his blood sugar fluctuations by testing his blood sugar levels several times a day, watching for physical symptoms of blood sugar fluctuations, and quickly adjusting his medication and/or diet to bring his blood sugar level within an acceptable range. Although Father received initial training in how to manage the child's diabetes, he did not attend any of the child's medical appointments, nor did he demonstrate to CSB that he understood how to manage the dietary restrictions during a short, supervised visit. Moreover, he demonstrated during visits that he did not appreciate the significance of the illness or that he must limit the amount of carbohydrates in the snacks that he brought for D.S. Although the caseworker reminded him that the child's snacks must be limited to a total of 15 grams of carbohydrates and even prepared him a list of appropriate snacks, Father often argued with her and tried to give the child inappropriate snacks.

{¶21} D.S. had adjusted to his current foster home and was attached to the family. According to the child's therapist, D.S. needs a stable and structured placement, such as the home of his current foster parents. The foster mother understands how to carefully manage the child's diabetes. The foster parents are interested in adopting D.S. and are willing to maintain a relationship between D.S. and his biological relatives.

{¶22} Because D.S. was less than five years old at the time of the hearing, the guardian ad litem spoke on his behalf. He opined that permanent custody was in the best interest of D.S. He expressed particular concern that Father had caused physical harm to the child and had failed to adequately remedy his long-standing problem with domestic violence. Evidence presented at the hearing demonstrated that Father had repeatedly caused physical harm to D.S., the mother of D.S., and the mother of his older child. The guardian ad litem described Father as a "big man" and testified that everyone he had spoken to about Father was afraid of him.

**{¶23}** The guardian ad litem further observed that he had not seen a bond between Father and D.S. because there was little interaction between them when Father visited. He also questioned Father's ability to manage D.S.'s diabetes, because he had not demonstrated an ability to do so even during short visits. He further emphasized that Father had never parented the child by himself.

**{¶24}** The custodial history of D.S. has involved him moving in and out of his parents' custody throughout his almost five-year life. During this case, he had spent almost two years outside of his parents' custody and had lived in three different temporary placements, so he was in need of a legally secure permanent placement. Neither parent was able to provide him with a suitable permanent home and CSB had been unable to find a suitable relative who was able to do so. Consequently, the trial court reasonably concluded that a legally secure permanent placement would be achieved by placing D.S. in the permanent custody of CSB. Father's assignment of error is overruled.

## III.

**{¶25}** Father's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

MOORE, J.
HENSAL, J.
CONCUR.


APPEARANCES:

RANDALL C. BRAY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

EMILY HETE, Attorney at Law for Appellee.

TONY PAXTON, Guardian ad Litem.