[Cite as *In re K.D.*, 2024-Ohio-5582.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: K.D. | : | APPEAL NOS. | C-240455 |
| | | | C-240475 |
| | : | TRIAL NO. | F/15/1993 X |
| | : | | |
| | : | | |
| | : | *O P I N I O N* | |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 27, 2024

*Christopher P. Kapsal*, for Appellant K.D.,

*Jeffrey J. Cutcher,* for Appellant Mother,

*Melissa A. Powers,* Hamilton County Prosecuting Attorney, and *Dmitriy Bikmayev*, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Klarysa Benge,* Assistant Public Defender, for the child's Guardian Ad Litem.

**Bock, Presiding Judge.**

**{¶1}** In this parental-termination case, appellants—Mother and her daughter, K.D.—appeal the juvenile court's decision to terminate Mother's parental rights and grant appellee Hamilton County Department of Job and Family Services ("JFS") permanent custody of K.D. Mother and K.D. raise similar sufficiency and manifest-weight challenges to the juvenile court's determination that granting permanent custody to JFS is in K.D.'s best interest over concerns with Mother's ability to safely manage K.D.'s type-1 diabetes.

**{¶2}** While it is clear that Mother and K.D. are bonded and love each other, we hold that the weight of the clear and competent evidence supports the juvenile court's determination that awarding permanent custody to JFS is in K.D.'s best interest. We come to this conclusion based on testimony and medical records showing that Mother does not have a sufficient understanding of her child's medical needs, which could have dire consequences, including K.D.'s death.

**{¶3}** We affirm the juvenile court's decision.

## I. Factual and Procedural History

**{¶4}** The following facts are undisputed and taken from K.D.'s medical records. K.D. is the second of Mother's three children.[1] Mother is hearing impaired and diabetic. In 2017, K.D. was eight years old when she was diagnosed with type-1 diabetes. That year, Cincinnati Children's Hospital Medical Center ("Children's Hospital") staff provided Mother and K.D.'s maternal grandmother ("Grandmother") a diabetes-education session. Although Mother was invested in K.D.'s care, she appeared overwhelmed.

---

[1] K.D.'s biological siblings are not involved in this case.

{¶5} From May 2019 to December 2020, K.D. was hospitalized seven times for diabetic ketoacidosis. As K.D.'s physician testified at the permanent-custody hearing, diabetic ketoacidosis is a "severe, potentially fatal complication" caused by high blood-glucose levels and insulin deficiency. During this time, K.D. was placed on a safety plan, which included educating Grandmother about caring for a diabetic child.

{¶6} After her first hospitalization in May 2019, Children's Hospital staff noted that K.D.'s diabetes was "poorly controlled"—her caregivers were inconsistent with K.D.'s blood-glucose monitoring, struggled with carbohydrate calculations, and regularly missed insulin injections. That same day, Children's Hospital submitted a Child Abuse Reporting Form to JFS based on K.D.'s caregivers' failing to maintain K.D.'s blood-glucose levels and manage her diabetes "despite numerous interventions from the medical and educational teams" following her diagnosis.

{¶7} Over the course of her seven hospitalizations, K.D. frequently arrived at the hospital nauseous, dehydrated, fatigued, suffering from headaches, and experiencing exceedingly high blood-glucose levels. There were ongoing concerns that the family's blood-glucose monitoring, carbohydrate calculations, and insulin injections were inconsistent, and that K.D. was eating food in secret. There were times when K.D. ran out of medication or blood-glucose test strips due to insurance issues.

{¶8} The medical records indicate that a community healthcare worker was involved with the family, and a diabetic educator met with the family 26 times since K.D.'s diagnosis. After K.D.'s seventh hospitalization for diabetic ketoacidosis, Children's Hospital submitted a second Child Abuse Reporting Form to JFS.

{¶9} In May 2021, JFS moved for temporary custody of K.D. and alleged that then 12-year-old K.D. was neglected and dependent, citing inconsistent management of K.D.'s diabetes. Following a hearing, the magistrate granted JFS interim custody of

K.D. In the entry, the magistrate recognized Mother's frustration that JFS had "made home visits without an interpreter" and that Mother "did not understand the terms of the 'safety plan' but [] was aware the plan involved [Grandmother]." The court appointed K.D. a guardian ad litem ("GAL").

{¶10} JFS developed a case plan for Mother with three goals. JFS was concerned that Mother was "unwilling or unable to meet [K.D.]'s immediate and serious physical or mental health needs." Mother needed an "accurate perception and [to] recognize her child's needs and wants to provide medical care for [K.D]." JFS suspected that a "cognitive delay" or "learning disability" played a part in Mother's confusion about diabetic care. The case plan acknowledged that K.D. is "very intelligent" and has "a strong family bond with plenty of extended family support." Under the case plan, Mother had to (1) "complete a Diagnostic Assessment with FAIR and follow all recommendations," (2) "attend all of [K.D.]'s medical appointments," and (3) "pass a diabetes test administered by Children's Hospital on diabetes."

{¶11} In August 2021, the juvenile court granted JFS temporary custody of K.D. after a finding of dependency. In April 2022, the magistrate extended JFS's temporary custody and found "significant progress on the case plan" and "reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of the extension." But four months later, JFS moved for permanent custody of K.D. after Mother and K.D.'s stepfather ("Stepfather") failed "to successfully complete any of the trainings to demonstrate [their] ability to properly care for [K.D.]'s serious medical condition."

{¶12} In September 2022, Mother moved for accommodations from JFS for the diabetes-education classes. She explained that, while she is hearing impaired and was diagnosed with borderline intellectual functioning, these are "impediment[s] to

Mother 'passing' the [diabetes education] test, but not for caring for [K.D.]." But before the magistrate held a hearing, Mother's attorney withdrew from her representation of Mother in March 2023, and Mother's new attorney withdrew the motion for accommodations at an April 2023 hearing.

### *Permanent-custody hearing*

**{¶13}** The magistrate held hearings on JFS's motion for permanent custody in August 2023, and January and February 2024. She heard testimony from Mother, the JFS caseworker, K.D.'s nurse practitioner, and K.D.'s physician. Mother testified with the help of two American Sign Language ("ASL") interpreters. The evidence included portions of K.D.'s medical records. During an in-camera interview, K.D. told the magistrate that she wants to live with Mother.

### *Diabetes, diabetic ketoacidosis, diabetic care, and diabetes education*

**{¶14}** K.D.'s physician, a pediatric endocrinologist at Children's Hospital, described how unmanaged diabetes can result in high blood-glucose levels, or hyperglycemia. High blood-glucose levels combined with prolonged insulin deficiency will result in the production of acids known as "ketones." Ketone buildup causes the blood to become more acidic, affecting a person's kidneys, heart, and other organs— "everything can shut down." Diabetic ketoacidosis can be fatal.

**{¶15}** K.D.'s physician testified that diabetic care includes monitoring "what [the child] eat[s], their activity, the rate at which their blood sugars are changing," and "signs and symptoms of having low blood sugar or high blood sugar." Blood glucose must be tested, at a minimum, eight to ten times every day: "before every meal, two to three hours after insulin is given and before you go to bed." K.D. currently wears a continuous-blood-glucose monitor, which reads her "blood sugar either every minute or five minutes" and shares that information with a smartphone app.

{¶16} K.D. was prescribed long-lasting daily insulin injections and "meal-time" insulin injections. The dosage for "meal-time" insulin varies and depends on the amount of carbohydrates in the meal. That amount is typically found on food labels. But some research is necessary for fruits and vegetables, or when eating outside of the home. Using the carbohydrate total, caregivers must calculate a "carb ratio" to determine the appropriate meal-time insulin dosage.

{¶17} K.D. currently wears an insulin pump, which can "speak" to her continuous-blood-glucose monitor through a smartphone app. The nurse practitioner testified that "a[n] [insulin] pump paired with a continuous glucose monitor is the best therapy that we have for Type 1 diabetes." Her insulin pump delivers a programmed long-lasting insulin injection. For "meal-time" insulin, a carbohydrate ratio and correction factor can be programed into the insulin pump. But the user or caregiver must input the user's blood-glucose level and the amount of carbohydrates that the user will consume. There is some troubleshooting, and the pump site must be changed "every three days at a minimum or when the pump runs out of insulin."

{¶18} K.D.'s nurse practitioner testified that a recently-diagnosed diabetic child and her family receive "two full days with an educator to learn about . . . Type 1 diabetes," how it changes a person's life, and expectations for care. Educators follow up with patients and their families after discharge from the hospital, but before their first provider appointment. Sometimes, educators meet with patients and families at the provider appointment. Educators also make an annual educator visit. K.D.'s nurse practitioner testified that Children's Hospital does not require parents to "pass [a] test before you can, you know, leave the hospital with your kid." She repeated that Children's Hospital does not "have like a physical you sit down and answer these ten questions" type of assessment. But educators have "built-in assess[ments] for

understanding" when they educate patients and families.

**{¶19}** K.D.'s physician described K.D. as "exquisitely smart" and "more likely to manipulate the diabetes." The JFS caseworker testified that K.D.'s inability to manage her diabetes is "behavioral"—she "chooses to self-sabotage by being dishonest about her levels or sneaking food." K.D.'s physician and nurse practitioner both testified that her hospitalizations for diabetic ketoacidosis were the result of blood-glucose mismanagement and a lack of insulin.

**{¶20}** When asked if Mother understood how to care for K.D.'s diabetes, K.D.'s nurse practitioner answered, "That's a hard question to answer." Mother was not resistant to providing care and "[t]here were some times where things were progressing in the right direction" and "longer periods of time between" hospitalizations. K.D.'s physician testified that diabetic care "is very difficult" and Mother "has had a hard time managing [K.D.'s] diabetes." But she clarified, "every mother has a hard time caring for a child with Type 1 diabetes."

**{¶21}** K.D.'s physician anticipated that when K.D. turns 18 years old, she "would probably be able to manage the details around her diabetes but would still need significant oversight" in terms of "insurance, paying for supplies, [and] ordering supplies." K.D. "can put information into her pump, but somebody just needs to be there to look to see that it's done." In a July 2022 entry in her medical records, K.D.'s medical team noted that "it seems [K.D.] is taking more ownership of her problem." She appeared more engaged in her teaching session and was "able to read labels better," and her blood-glucose was stabilizing.

### *No hospitalizations following JFS's intervention*

**{¶22}** The JFS caseworker identified two areas of concern with K.D.'s diabetes. First, Mother repeatedly asked K.D. to manage her own care. Second, Mother was

frustrated with "K[.D.] for sneaking snacks into her room and not being honest with her diabetic care."

**{¶23}** The JFS caseworker explained that K.D.'s mental-health struggles had affected her foster placement, which changed several times while she was in JFS's custody. There was evidence of self-harm in her initial foster placement, which led to a stay in Children's Hospital. There were placements in a respite home and with a relative that were cut short because of the diabetes-education classes and K.D.'s behavior. K.D. had a nine-month stay in "a lock-down facility" at a Children's Hospital satellite location, where she received "intense therapy." K.D. "has medical trauma" that she is "working on" with mental-health professionals and "will occasionally try to [induce diabetic ketoacidosis] herself."

**{¶24}** K.D. is "actually doing very well" in her current foster home. JFS's concern with self-harm has been somewhat resolved. While K.D.'s blood-glucose levels have "gone above 500" and ketones have been detected in her urine, her foster mother has called Children's Hospital's Endocrinology Department when those symptoms were detected and prevented diabetic ketoacidosis. K.D. has not been hospitalized since moving into her current foster home. But K.D. still is "sneaking snacks and not being honest to foster mom" and refuses to test for ketones. JFS knows this because her foster mother regularly checks her blood-glucose levels.

### *Mother fell short of completing her case plan*

**{¶25}** Mother completed diagnostic and psychological assessments as part of the case plan. Testing revealed that Mother has "a cognitive impairment that limited her understanding." She also suffers from depression. When JFS became involved, Mother was newly engaged and pregnant. She "verbalized that she was having a hard time with everything kind of going on." Mother has tried, but failed, to pass "the

8

diabetic education classes."

**{¶26}** According to the JFS caseworker, the diabetes-education classes included a "paper test" that assesses Mother's understanding of diabetes care. Mother had "six or seven" unsuccessful attempts to pass it. The caseworker agreed that Mother "always engage[s] in the course." But she is "just not able to accurately do the calculations or understand the differences in individual like servings of carbs and carbs on the package." These shortcomings led the caseworker to stop "pressing so hard to kind of see if [Mother] would take the initiative and try to come" to K.D.'s appointments.

**{¶27}** Mother initially attended K.D.'s appointments, though her attendance has "fallen off in the recent history." The JFS caseworker was "not sure if [Mother] always receive[d] notice" of K.D.'s medical appointments. But the caseworker testified that Mother "does not seek out the information" and suggested that Mother should have periodically called the hospital or the agency to find out if K.D. had appointments. The caseworker schedules those appointments and agreed at the hearing that notifying Mother of K.D.'s appointments would have been reasonable.

**{¶28}** K.D.'s medical records include some documentation involving Mother's diabetes-education and review sessions. They indicate that Mother was provided an interpreter at some education sessions, while other records fail to mention one. Some of the diabetes-education records state that Mother "was able to identify correct serving size and carbs. Mother was confidently able to identify foods that contain carbohydrates." In that education session, Mother asked for more complicated scenarios so that she did not have to ask for help.

**{¶29}** But medical notes from 2019 state Mother met with the diabetes educator 26 times and continued to insist that K.D. should manage her diabetes

herself, despite the hospital advising otherwise. K.D. was disruptive at the education sessions she attended. Mother struggled to demonstrate consistent understanding of carbohydrate counting and failed to grasp dividing serving sizes and the impact of miscalculations on blood-glucose levels.

{¶30} In January 2022, Mother and Stepfather, who is also hearing impaired, attended a final education session with the help of an interpreter. They were instructed about how to use a smartphone app but were unable to adjust carbohydrate calculations based on different serving sizes. While Mother eventually calculated insulin dosage using a chart, added "meal-time" insulin and correction doses together, and identified both total carbohydrates and serving sizes from food labels, Children's Hospital identified four areas of concern with Mother. She struggled to identify carbohydrate-rich foods, calculate carbohydrates from food labels, manage a continuous-glucose monitor, and identify types of insulin. The educator concluded that Mother and Stepfather "ha[d] not demonstrated adequate understanding of diabetes concepts to safely provide independent diabetes care for [K.D.] at home."

{¶31} Most of Mother's education classes are described in a March 2022 letter from a Children's Hospital social worker, who paraphrased the diabetes educator notes.[2] The letter informed the juvenile court that "additional BBT education would not ensure the patient's mother can care for the patient's diabetes safely." But K.D. "could switch from BBT to a 70/30 insulin regimen," which would "require[] the patient to eat specific amounts of carbs at specific times of day." Under this regimen,

---

[2] This letter was included in K.D.'s medical records, which were admitted into the evidence under Evid.R. 803(6)'s hearsay business-record exception. This letter appears to have been drafted for this court case, not made in "the regular practice" of Children's Hospital's business activity, and therefore constitutes hearsay. *See* Evid.R. 803(6). But Mother and K.D. failed to object to the admission of this letter and do not contest its admission on appeal.

the risk of diabetic ketoacidosis increases if doses are missed, or if the patient fails to follow a rigid diet.

{¶32} K.D. has supervised visitation with Mother in Mother's home. The JFS caseworker testified that they have a "great bond." But the caseworker was concerned that, during visitation, K.D. "will just go in the kitchen, grab her own food, no attempts to give herself medication or even not, and there's little to no intervention from [Mother] when that occurs." During one visit, K.D. "went in the kitchen got herself some Doritos, a juice and a frozen meal, heats it up and is trying to eat and nobody in the home intervenes." The caseworker stopped K.D. and counted her carbs. Mother "did not interact with that aspect of the visit at all." According to the caseworker, "nobody paid any attention to this child eating and drinking all of these things." During a later visit, K.D. miscalculated her carbohydrates. The caseworker realized the error, "at which point mom also realized," and prompted K.D. to give herself more insulin.

### Mother testified

{¶33} Mother testified with the help of two interpreters.[3] She recalled receiving weekly in-home visits from a nurse, who assisted Mother and K.D. with K.D.'s diabetic care. But Mother stopped counting carbohydrates when those visits ended because she "didn't have anyone to come help." She described the circumstances that led to K.D.'s hospitalizations for diabetic ketoacidosis. While Mother read books on diabetic care and spoke to K.D.'s physicians, K.D. continued to put herself in harm's way by sneaking food. Mother described K.D. as stubborn

---

[3] During Mother's testimony, there were several unexplained interpreter switches. At one point, Mother apologized about her signing because she was "a little nervous" and "a little shaky." There are several points in Mother's testimony when the interpreters had to clarify Mother's responses, rephrase questions, or report an "interpreter error."

because things go "in one ear and out the other." Mother has emphasized to K.D. that she "need[s] to be responsible, . . . not be stubborn[,] and take care of [her]self."

{¶34} Mother described the diabetes-education session provided by Children's Hospital. She could not recall how many sessions she attended. She explained that an interpreter assisted her during her first education session and she "went through that education, great." But she was not provided an interpreter for the second education session. She disagreed that she struggled with the remote interpreter during her third session and was surprised to learn that she failed it.

{¶35} Most of Mother's testimony focused on the care that K.D. requires. Mother explained that caring for K.D. requires checking her blood sugar before breakfast, instructing K.D. to see the nurse at lunch, sending Children's Hospital K.D.'s levels, ensuring K.D.'s blood glucose is around 100, and monitoring K.D.'s diet, specifically the snacks that she eats. When asked how she would prevent future diabetic ketoacidosis episodes, Mother discussed having a continued dialogue with K.D. and Children's Hospital about diabetes management and monitoring K.D.'s diet so "her numbers stay at a consistent level." K.D.'s diabetes depends on her diet to the extent that the amount of carbohydrates in her foods impacts her blood-glucose levels, and a consistent diet would result in consistent numbers. It "would be dangerous for [K.D.]" to manage her own diabetes because high blood sugar would compromise K.D.'s "ab[ility] to function" and her "energy would bottom out."

{¶36} Mother was asked about K.D.'s routine again, and after describing a daily schedule, testified that she would "check her sugar, document everything, make sure it's all okay, do all the formulas." In the morning, she would "check her blood sugar levels, we'll do the test, and we'll see if it's balanced." She would then record those levels. To check K.D.'s blood-glucose levels, Mother must "find whatever she's

eating," the serving size, and the amount of carbohydrates. She clarified, after several interjections by the interpreter about difficulty interpreting Mother's testimony, that K.D.'s monitors "will tell her numbers." Using that blood-glucose level, K.D. receives a shot of insulin based on "the carbs, all the things – it's the formula, everything that she's eaten, so then the insulin combats that." K.D.'s insulin varies based on "whatever the number says, then you will be able to then take it and adjust it, the unit." If K.D. follows a diet and receives her insulin, her diabetes will be managed.

{¶37} Mother was asked about K.D.'s tendency to eat snacks. Mother testified that she would hide food so K.D. "would not think about snacks anymore." She has told K.D. "many, many, many times that she needs to stop sneaking snacks" and warned her, "you can die." Mother recalled a phone call with K.D. where she tried to make K.D. understand that snacking is one of the reasons she is in a foster placement. When K.D. returns home, Mother will keep snacks out of sight to not tempt K.D. Mother would also speak with K.D.'s physician for possible solutions.

{¶38} Mother was specifically asked what she would do if she found out that K.D. had eaten snacks in secret. Mother testified that she would punish K.D., take the food away, and talk to K.D. about the importance of not eating food in secret. She was asked a follow up question about checking her blood-glucose levels, and Mother answered that she would "definitely" check K.D.'s levels. She would "make sure if her numbers were high," and if they were, she would contact a nurse or consult a book.

{¶39} Mother explained that she would take K.D. to the hospital if she showed a range of "different symptoms," including lethargy, dehydration, and fatigue. If K.D.'s blood-glucose levels were elevated, Mother "would immediately call 9-1-1 and let them know that she needed to go to the hospital." If her numbers were low, she would give her skittles "or make sure she has something that would boost up her sugar."

### *The juvenile court awarded JFS permanent custody*

**{¶40}** The magistrate analyzed the case under R.C. 2151.414 and recommended a discretionary award of permanent custody to JFS, which she found to be in K.D.'s best interest because "Mother cannot safely care for [K.D]." Mother and K.D. objected. The juvenile court conducted an independent review of the record, overruled the objections, and adopted the magistrate's findings and conclusions of law because "the risk of [K.D.'s] death is far too high if she returns to Mother."

**{¶41}** Mother and K.D. filed separate appeals of the juvenile court's permanent-custody decision, and we consolidated those appeals.

## II.    Analysis

**{¶42}** Mother and K.D. both challenge the juvenile court's best-interest findings and analysis on sufficiency and manifest-weight grounds. Mother does so in two assignments of error, while K.D. marshals her arguments in one assignment of error. Both maintain that several best-interest factors supported the return of K.D. to Mother's custody, and both dispute the juvenile court's determination that Mother cannot adequately support K.D.'s medical needs. Both Mother and K.D. also identify several facts that support the return of K.D. to Mother's custody that the juvenile court allegedly overlooked. We address Mother's and K.D.'s arguments together.

**{¶43}** As an initial matter, Ohio's permanent-custody statute was amended effective April 3, 2023. *See* R.C. 2151.414. There were "minor changes" to the statute. *In re C.W.,* 2024-Ohio-4987, ¶ 43 (1st Dist.), citing *In re J.P.,* 2024-Ohio-2794, ¶ 17 (1st Dist.). But the version of the statute that was in effect when the motion for permanent custody was filed governs. *Id.* The permanent-custody motion in this case was filed on July 7, 2022, so we apply the 2022 version of the statute.

**{¶44}** The right to raise a child is essential. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). The right is fundamental to the "basic civil rights of man[kind]." *Skinner v. Oklahoma,* 316 U.S. 535, 541 (1942). It "is perhaps the oldest of the fundamental liberty interests" protected by the Fifth and Fourteenth Amendments to the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). But these interests are "not absolute" and may be terminated with an award of permanent custody of a child to a state agency "when it is necessary for the 'welfare' of the child." *In re Cunningham,* 59 Ohio St.2d 100, 105 (1979).

**{¶45}** When JFS elects to file a motion for permanent custody of a child, it seeks to strip "the natural parent[] . . . of all parental rights, privileges, [and] obligations, including all residual rights and obligations." R.C. 2151.011(B)(31). Residual rights and obligations include, but are not limited to, "the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support." R.C. 2151.011(B)(50). So, permanent custody "has been described as 'the family law equivalent of the death penalty in a criminal case.'" *In re D.A.*, 2007-Ohio-1105, ¶ 10, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist. 1991). This is an "extreme disposition," and permanent custody must be "an alternative of 'last resort.'" *Id.* The statutory scheme makes clear that "separating the child from the child's parents [is justified] only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A).

### A. The juvenile court's decision is supported by sufficient evidence

**{¶46}** The juvenile court must make two findings before exercising its discretion and awarding a state agency permanent custody of a child. First, clear and convincing evidence must show that one or more of the five statutory conditions listed in former R.C. 2151.414(B)(1) applies to the case. *See In re C.W.*, 2024-Ohio-4987, at

15

¶ 44 (1st Dist.). Second, clear and convincing evidence must show that awarding the agency permanent custody is in the best interest of the child. *Id.* The parties do not dispute that K.D. was in JFS's temporary custody for more than 12 months within a 22-month period, satisfying former R.C. 2151.414(B)(1)(d).

**{¶47}** K.D.'s best interest is at the heart of this appeal. At the dispositional stage, a child's best interest is "the primary consideration in questions of possession or custody of children." *In re Cunningham*, 59 Ohio St.2d at 105. When making a discretionary award of permanent custody to a state agency, the juvenile court must consider and weigh multiple statutory factors "'to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *In* re *C.W.* at ¶ 45, quoting *In re J.P.*, 2024-Ohio-2794, at ¶ 39 (1st Dist.).

**{¶48}** To review the sufficiency of the evidence in a permanent custody case, we "independently review the evidence to determine if the [juvenile] court's decision is supported by clear and convincing evidence." *Id.* at ¶ 47. Every finding must be supported by clear and convincing evidence. *Id.* Clear and convincing evidence is "'more than a mere "preponderance of the evidence,"'" but does not require the "'certainty as is required "beyond a reasonable doubt" in criminal cases.'" *Id.* at ¶ 46, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 (1954), paragraph three of the syllabus. We will affirm the juvenile court's decision if the evidence is legally sufficient to support the juvenile court's decision. *In re Z.C.,* 2023-Ohio-4703, ¶ 13, quoting *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).

**{¶49}** When considering the best interest of a child in a permanent custody case, former R.C. 2151.414(D)(1) instructs the juvenile court to

consider all relevant factors, including, but not limited to

16

. . .

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's [GAL], with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶50}** A child's best interest is a """"fluid concept, as it involves the child's continually-changing need for appropriate care."""" *In re D.V.,* 2022-Ohio-1024, ¶ 12 (1st Dist.), quoting *In re D.M.,* 2020-Ohio-3273, ¶ 47 (1st Dist.), quoting *In re G.L.S.,* 2018-Ohio-1606, ¶ 16 (9th Dist.). The juvenile court must consider and weigh these best-interest factors, and any other relevant factor, to determine the child's best interest. *In re Schaefer,* 2006-Ohio-5513, ¶ 56. No single factor is elevated or given undue emphasis when considering the child's best interest. *Id.*

**{¶51}** Importantly, the juvenile court may not base its best-interest determination under former R.C. 2151.414(D) "solely on the limited cognitive abilities of the parents." *In re D.A.,* 2007-Ohio-1105, ¶ 36. There must be other evidence that

the parent has "caused or threatened to cause harm" to the child. *Id.* at ¶ 39. Ohio appellate courts have affirmed awards of permanent custody based, in part, on the parents' inability to show that they understood how to manage the children's type-1 diabetes. *See In re D.S.,* 2016-Ohio-7761, ¶ 20 (9th Dist.) (although father received training to care for five-year-old child's type-1 diabetes, the evidence showed that father could not show he understood how to manage the condition or appreciate the significance of the diagnosis); *see also In re J.R.,* 2017-Ohio-1056, ¶ 38 (8th Dist.) (holding that clear and convincing evidence supported the juvenile court's finding that a mother "had been unable to 'continuously and repeatedly demonstrate her ability to manage'" her child's type-1 diabetes).

{¶52} Here, the juvenile court adopted the magistrate's findings and best-interest analysis, which considered each statutory factor. Those findings recognized that K.D.'s "most significant relationship is the relationship with Mother," that Mother "clearly loves and cares for [K.D.]," and that K.D. wants to return to Mother's care.

{¶53} But the magistrate found that K.D.'s time in JFS's temporary custody "far exceed[ed] a reasonable amount of time." The most significant factor favoring an award of permanent custody was K.D.'s need for a legally secure placement. A legally secure placement """is more than a house with four walls.""" *In re S.D.,* 2020-Ohio-3379, ¶ 82, quoting *In re P.,* 2019-Ohio-3637, ¶ 42 (1st Dist.), quoting *Matter of K.W.,* 2018-Ohio-1933, ¶ 87 (4th Dist.). It encompasses """a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.""" *Id.,* quoting *In re P.* at ¶ 42, quoting *Matter of K.W.* at ¶ 87.

{¶54} The magistrate found that "[t]he evidence is clear that Mother cannot safely care [for] [K.D.]." She explained that K.D.'s diabetes is a "life and death medical condition" that was inconsistently managed in Mother's care. She found that Mother

lacked insight and an ability "to understand the seriousness of type 1 diabetes." And she cited "Mother's failure to adequately engage in diabetes education." The juvenile court added, "Mother is not able to provide sufficient care to [K.D.] given her diagnosis of Type 1 Diabetes." It highlighted K.D.'s "seven hospitalizations" while in Mother's custody. In contrast, K.D. "has not experienced another instance of [diabetic ketoacidosis] since her removal."

**{¶55}** These findings are supported by clear and convincing evidence. K.D.'s nurse practitioner and physician described the severity of diabetic ketoacidosis. K.D.'s medical records indicate that Children's Hospital had lingering concerns about Mother's ability to safely manage K.D.'s diabetes after her final education session in January 2022. The registered nurse that instructed Mother noted that an ASL interpreter was present for the entire visit, but Mother and Stepfather failed to demonstrate an understanding of how to care for a child with type-1 diabetes. Plus, the JFS caseworker described two visitation sessions where Mother failed to intervene when K.D. miscalculated her carbohydrates.

**{¶56}** K.D. and Mother argue that there is not clear and convincing evidence that Mother is unable to care for K.D.'s diabetes. Both claim that Mother's testimony proved her understanding of how to provide satisfactory care for a child with type-1 diabetes. Both also argue that there is evidence that the assistive technology has changed the way K.D.'s diabetes must be cared for. But these arguments are better suited for their manifest-weight argument because "'sufficiency is a test of adequacy.'" *In re Z.C.,* 2023-Ohio-4703, at ¶ 13, quoting *Thompkins*, 78 Ohio St.3d at 386.

**{¶57}** In sum, we hold that there is sufficient evidence supporting the juvenile court's finding that an award of permanent custody to JFS is in K.D.'s best interest. We overrule Mother's first assignment of error.

### B. *The juvenile court decision is not against the manifest weight of the evidence*

{**¶58**} Both Mother and K.D. argue that the juvenile court's decision is contrary to the manifest weight of the evidence. To reverse the juvenile court's permanent-custody decision, we must find that the juvenile court lost its way when resolving evidentiary conflicts and created a manifest miscarriage of justice. *In re C.W.*, 2024-Ohio-4987, at ¶ 48 (1st Dist.). In doing so, we must "weigh the evidence and all reasonable inferences, [and] consider the credibility of the witnesses." *In re Z.C.* at ¶ 14. The "'manifest weight of the evidence'" refers to a greater amount of credible evidence and relates to persuasion. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. The weight of the evidence ""is not a question of mathematics, but [a question of the evidence's] effect in inducing belief."" *In re Z.C.* at ¶ 13, quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *Black's*.

{**¶59**} The Ohio Supreme Court has cautioned that, when weighing the evidence, appellate courts "must always be mindful of the presumption in favor of the finder of fact." *Id*. That presumption applies to testimony that the trier of fact was able to view to make first-hand credibility determinations. *Id*. If evidence can be construed in multiple ways, we are ""bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."" *Eastley* at ¶ 19, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984), quoting 5 Ohio Jur.3d, Appellate Review, § 60, at 191-192 (1978).

{**¶60**} Again, Mother and K.D. argue that Mother proved that she understood how to adequately manage K.D.'s diabetes and medical needs, and that she appreciated the serious nature of that diagnosis. They argue that the juvenile court failed to account for her hearing impairment and interpretation issues.

**{¶61}** Mother and K.D. are correct that the transcript reveals issues with the interpreters at her hearing. And the medical records in the evidence are less than clear as to whether an interpreter was present at every education session. But K.D.'s medical records explain that an ASL interpreter was present at her most recent education session. Following that session, Children's Hospital concluded that Mother was unable to safely manage K.D.'s diabetic care. That conclusion is supported by the eyewitness testimony of the JFS caseworker, who described incidents during two visitation sessions where Mother failed to intervene to care for K.D.'s diabetes. Mother failed to intervene when K.D. ate food and did "not attempt[] to give herself medication." Mother also failed to intervene when K.D. miscalculated carbohydrates.

**{¶62}** Mother and K.D. dispute the magistrate's characterization of Mother's testimony at the permanent-custody hearing. The magistrate concluded that Mother lacked insight about K.D.'s diagnosis, citing Mother's belief at the hearing that she had passed an education session and that K.D.'s diabetic care involved dietary restrictions. The magistrate emphasized Mother's response to a question about the steps she would take if she discovered that K.D. was eating food in secret, because Mother did not initially explain that she would check K.D.'s blood-glucose levels.

**{¶63}** There is some support in the record for Mother's view that K.D.'s diet must be monitored. And Mother did eventually testify that she would check K.D.'s blood-glucose levels. But the JFS caseworker's testimony contradicts Mother's assurances that she would intervene if she discovered that K.D. was eating food without correcting her blood-glucose with an insulin dosage.

**{¶64}** Mother and K.D. argue that K.D.'s circumstances today compared to when she was admitted to the hospital for diabetic ketoacidosis have changed. They explain that K.D. is older and better positioned to manage her diabetic care. She also

21

has a continuous glucose monitor and insulin pump, which she did not have when she lived with Mother. The medical records include notes from her medical team explaining that K.D. was more engaged in recent diabetes-education sessions and "taking more ownership of her problem." But again, the JFS caseworker observed K.D. around that time and K.D. made no attempt "to give herself medication" after eating. And months later, she miscalculated the carbohydrates in food that she ate. Plus, the final education session identified Mother's ability to manage K.D.'s continuous glucose monitor as an area of concern.

{¶65} The juvenile court recognized Mother's efforts and bond with K.D. There is no denying that Mother and K.D. love one another. The juvenile court, however, found that a grant of permanent custody to JFS was necessary to ensure that K.D.'s type-1 diabetes is properly managed.

{¶66} Although we recognize that legally terminating the relationship between Mother and K.D. is a harsh remedy—particularly because Mother was able to care for her other children without issue—the evidence is clear that unless someone properly manages K.D.'s diabetes, she could die. The juvenile court's conclusion that permanent custody is necessary to ensure proper management of K.D.'s type-1 diabetes is supported by the weight of the evidence. Accordingly, we must overrule K.D.'s assignment of error and Mother's second assignment of error and affirm the juvenile court's decision to grant JFS permanent custody of K.D.[4]

---

[4] Ohio does not currently have "a 'reinstatement statute'" or other statutory mechanism for Mother to file for custody of K.D. following the termination of her parental rights. *In re N.P.,* 2019-Ohio-1053, ¶ 15 (9th Dist.). But R.C. 2151.313(F)(2) provides that a child-services agency, "or any party, other than any parent whose parental rights with respect to the child have been terminated . . . may at any time request the court to modify or terminate any order of disposition" by filing a motion with the juvenile court. The Ohio Supreme Court has explained that a parent like Mother "may have an opportunity to obtain custody in the future, but only upon the initiative of Hamilton County Job and Family Services." *In re McBride,* 2006-Ohio-3454, ¶ 14.

### III. Conclusion

**{¶67}** We overrule Mother's and K.D.'s assignments of error and affirm the juvenile court's grant of permanent custody to JFS.

Judgment affirmed.

ZAYAS, **J.,** concurs in judgment only.
KINSLEY, **J.,** concurs separately.

KINSLEY, **J.,** concuring separately,

**{¶68}** I agree with the court's determination that, on the record before us, the weight of the evidence supports the juvenile court's determination that parental termination is in K.D.'s best interest, as that term is defined by R.C. 2151.414(D)(1). But I write separately to highlight the problematic policy that Ohio's parental termination statutes advance in cases like K.D.'s.

**{¶69}** K.D. will likely spend the remainder of her childhood without a parent simply because Mother lacked the cognitive capacity to manage her diabetes.[5] By considering a parent's ability to provide adequate medical care as part of the best-interest inquiry, Ohio is solidly in the minority in allowing this outcome. *See* John Pevy, *Homeopathy, Holistic Medicine, and Parental Rights: What Role Should the Government Play in Regulating Parents' Rights to Choose Appropriate Medical Care for their Children?*, 21 U.C. Davis J.Juv.L. & Pol'y 145, 149, fn. 11 (2017) (noting that Ohio is one of only six states to allow for parental termination on the grounds of a

---

[5] The record indicates that K.D. has spent time in several different foster placements during time in the custody of JFS. As is to be expected, we have no information that her current foster placement is interested in adopting her. This is expected, because the harsh reality is that younger children who are in JFS's permanent custody are typically adopted, while older children like K.D. often fail to find a permanent family home. *See* Dale Margolin, *Every Adolescent Deserves A Parent*, 40 Cap.U.L.Rev. 417, 419, fn. 10 (2012) (cataloging studies that document lower adoption rates for adolescents in the foster care system compared to younger children who are similarly adoptable). In fact, adolescents who are permanently removed from their parents are startlingly **33 times** more likely to remain in foster care for the duration of their childhood than preschoolers. *Id.*, citing Ada Schmidt-Tieszen & Thomas P. McDonald, *Children Who Wait: Long-Term Foster Care or Adoption?*, 20 Child & Youth Serv.Rev. 13, 24 (1998).

parent's inability to provide adequate medical care). Sadly, Ohio law affords no alternative solutions like medical guardianship or temporary termination of parental rights that would allow Mother to retain a role in K.D.'s life. *See, e.g.,* Vivek S. Sankaran & Christopher E. Church, *The Ties That Bind Us: An Empirical, Clinical, and Constitutional Argument against Terminating Parental Rights*, Family Court Rev. 61(2), 252 (2023) (discussing guardianship alternatives to parental termination employed in Alabama, Wisconsin, and North Carolina); LaShanda Taylor, *Resurrecting Parents of Legal Orphans: Un-Terminating Parental Rights*, 17 Va.J.Soc. Pol'y & L. 318, 349-366 (2012) (describing temporary termination of parental rights procedure). This, in my mind, is a flaw in Ohio's child-protection legislation, because it harms, rather than protects, children like K.D.

**{¶70}** Study after study documents the stigma of removing children from their parents. *See, e.g.,* Matthew B. Johnson, *Examining Risks to Children in the Context of Parental Rights Termination Proceedings*, 22 N.Y.U.Rev.L. & Soc.Change 414 (1996) (discussing psychological data on parental separation and termination). Leaving a child without a parent, as is likely to happen to K.D., therefore has serious detrimental consequences to the child. For one, children who are the subject of parental-termination proceedings typically experience an ambiguous sense of loss that society does not recognize. *See* Robert E. Lee & Jason B. Whiting, *Foster Children's Expressions of Ambiguous Loss*, 35 Am.J.Fam.Therapy 419, 425-426 (2007). This leaves these children without time and structure for grieving the loss of their parent. Gina Miranda Samuels, *A Reason, A Season, or a Lifetime: Relational Permanence among Young Adults with Foster Care Backgrounds*, Chaplin Hall Center for Children 13 (2008). For another, children who age out of foster care without finding a permanent home disproportionately experience homelessness, incarceration, and

unemployment. *See* Martin Guggenheim, *The Failure to Repeal the Adoption and Safe Families Act Will Long be a Stain on this Period of American History*, Family Integrity & Justice Quarterly 54, 57 (2022).

**{¶71}** As such, K.D.'s actual best interest—not that defined by a legislature that clearly did not have her specific situation in mind when it drafted the statues we apply today—is served by Mother's continued involvement in her life. For this reason, I implore JFS, as K.D.'s legal custodian, to permit ongoing contact between Mother and K.D. in a safe and structured way. Even though Mother is no longer K.D.'s legal parent, she is a loving and supportive adult who can provide the emotional stability that K.D. will need to navigate life on her own. Even if JFS does not create these opportunities, nothing prohibits K.D., on her own initiative, from remaining in contact with Mother. *See* Sankaran & Church at 257-259 (noting that children of parents whose rights are terminated often remain in contact with their families of origin even when they cannot provide care).

**{¶72}** Our opinion today determines Mother's legal relationship to K.D. It does not determine her actual relationship to her daughter. Nothing we decide in this case alters the fact that Mother gave K.D. life, loves her deeply, and is capable of providing care and support to her in every area except with regard to her life-threatening diabetic condition. Nothing we decide today changes the fact that Mother is K.D.'s mom.

**{¶73}** K.D. herself, by challenging the termination of Mother's parental rights, has made her voice quite clear: she wants to have a parent. More than she wants to have assistance in managing her diabetes, which has nearly killed her on several occasions. That longing is profound and significant. It is not lost on me. I hope it is not lost on those whose job it is to now care for K.D. I deeply regret that the law did not

allow us to honor K.D. and Mother with a different outcome.

Please note:

The court has recorded its entry on the date of the release of this opinion.