**[Cite as *In re A.Y.C.*, 2023-Ohio-4494.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: A.Y.C. and E.Y.C. | : | APPEAL NO. C-230496 |
| | | TRIAL NO. F19-15X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: December 13, 2023

*Cynthia S. Daugherty,* for Appellant Mother,

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Megan E. Busam,* Assistant Public Defender, Attorney for the Guardian ad Litem for A.Y.C. and E.Y.C.

CROUSE, **Presiding Judge.**

{¶1} Appellant mother appeals from the trial court's judgment granting permanent custody of her children, A.Y.C. and E.Y.C., to the Hamilton County Department of Job and Family Services ("HCJFS"). In a single assignment of error, mother argues that the trial court erred as a matter of law in granting HCJFS's motion for permanent custody. Because the trial court's judgment was supported by both the sufficiency and the weight of the evidence, we find mother's argument to be without merit and affirm the trial court's judgment.

## I. Factual and Procedural Background

{¶2} A.Y.C. was taken into HCJFS custody shortly after his birth on April 25, 2020. HCJFS had concerns with domestic violence in the parents' relationship. Father was escorted from the hospital after A.Y.C.'s birth for threatening domestic violence against mother, and there were allegations that father had previously stabbed mother. HCJFS had additional concerns about the parents' mental health, the parents' drug activity, the safety of the parents' housing, and mother's history with HCJFS concerning her older children. The agency filed a complaint for temporary custody of A.Y.C. on April 28, 2020, and was granted an interim order of custody that same date. A case plan was filed for the family establishing goals for reunification and services to be engaged in.

{¶3} This case was filed during the height of the COVID-19 pandemic, and on September 22, 2020, the magistrate issued an order continuing the matter for a day-one hearing and stating that, due to the pandemic, the matter could not be completed within the 90-day period required by statute. On October 6, 2020, HCJFS dismissed the complaint filed on April 28, 2020. That same date, it refiled the complaint for

temporary custody, as well as a motion for an interim order of temporary custody. The complaint alleged that A.Y.C. was neglected and dependent. It restated the domestic-violence allegations from the initial complaint and the allegations that mother had lost custody of two older children. The complaint additionally stated that both parents resided with maternal grandmother in a home without a working furnace, a stove or a refrigerator, and that electricity and water to the home were being shut off due to nonpayment of bills. And it contained allegations about both parents' mental health, stating that mother was diagnosed with ADHD and Bipolar disorder, and that father likewise had received those same two diagnoses, as well as a diagnosis of Post Traumatic Stress Disorder ("PTSD").

{¶4} The magistrate conducted a day-one hearing on October 7, 2020, and granted the motion for an interim order of temporary custody. On November 23, 2020, the magistrate issued an order stating that all parties waived any objection to completion of the adjudication and disposition within 90 days of the filing of the complaint.

{¶5} On February 23, 2021, the magistrate issued a decision adjudicating A.Y.C. dependent and committing him to the temporary custody of HCJFS. The allegation of neglect was dismissed. On March 17, 2021, HCJFS filed a motion to extend the temporary custody of A.Y.C., stating that progress was being made on the case plan. That motion was granted.

{¶6} E.Y.C. was born on June 25, 2021, and on June 29, 2021, HCJFS filed a complaint for temporary custody alleging that he was dependent. The agency also filed a motion for an interim order of temporary custody, which was granted after the magistrate conducted a day-one hearing.

3

{¶7} On August 24, 2021, HCJFS filed a motion to modify temporary custody of A.Y.C. to permanent custody. An amended motion was filed on August 30. A maternal aunt filed, but later withdrew, petitions for custody of both A.Y.C. and E.Y.C.

{¶8} On September 16, 2021, the magistrate issued an order stating that all parties waived any objection to completion of the adjudication and disposition of E.Y.C. within 90 days. On November 16, 2021, a decision was issued adjudicating E.Y.C. dependent and committing him to the temporary custody of HCJFS. Approximately four months later, on March 11, 2022, HCJFS filed a motion to modify temporary custody of E.Y.C. to permanent custody.

{¶9} Over the course of a five-month period, a four-day trial was held on both motions for permanent custody. The foster mother of A.Y.C. and E.Y.C. testified that both children were placed in her care within days of their births. She discussed their significant medical issues and needs. Foster mother testified that A.Y.C. has cerebral palsy and wears braces to assist with bowing in his legs and toe pointing. He has been able to walk unassisted since September 2022. She explained that A.Y.C. also requires an extremely high level of supervision because he engages in self-injuring behavior. He often has to wear a helmet because he purposefully slams his head against a wall or other surfaces. A.Y.C. receives physical therapy, occupational therapy, speech therapy, and behavioral therapy for his self-injuring. Several of these therapies require foster mother to work with A.Y.C. on various skills and exercises outside of the appointments. A.Y.C. also has a cyst on his brain that requires monitoring via an MRI every six months.

{¶10} Foster mother testified that E.Y.C. has been diagnosed with failure to thrive. He has no desire to eat and has a feeding tube in his stomach. He receives a

4

special formula via the feeding tube because he cannot tolerate normal baby food and is allergic to a protein in cow's milk. An emergency kit for E.Y.C.'s feeding tube must be carried at all times.

{¶11} Foster mother stated that both children have undergone genetic testing and have a genetic mutation connected to the X chromosome that affects their development. She explained that E.Y.C. also suffers from a condition she referred to as SMAD6, which can affect the formation of the plates in his head and heart development.

{¶12} Foster mother kept a list of all of medical appointments that the children have attended, including whether mother had attended the appointment. According to foster mother, out of approximately 181 appointments, mother attended 49. Foster mother stated that she has two biological children that are close in age to A.Y.C. and E.Y.C., and that she would be willing to adopt the children if it was an option.

{¶13} Abbey Turner, the HCJFS caseworker for A.Y.C. and E.Y.C., testified about the services that had been offered to mother and mother's engagement in those services. Mother completed a Diagnostic Assessment of Functioning ("DAF") in 2020. HCJFS implemented a case plan for mother that required her to submit to random toxicology screens, complete a Department of Development Services ("DDS") assessment, engage in parenting classes, attend the children's medical appointments and visitation, and obtain stable housing and income. The DAF did not recommend that mother engage in any mental-health services. But during the pendency of the action, mother indicated that she wished to engage in therapy for symptoms related to depression and PTSD, so she completed a second DAF to assist her in obtaining access to those services. The second DAF resulted in mother being referred to therapy and

related services at the Talbert House. While a therapist for mother became available in September 2021, mother was inconsistent in her attendance until February 2022, when she began attending therapy regularly.

{¶14} With respect to the random toxicology screens required by the case plan, Turner testified that mother missed a few screens early on, but was otherwise consistent. Turner explained that mother tested positive for cocaine and marijuana on her first screen. In response to the positive test, mother admitted to using marijuana, but stated that, unknown to her, it had been laced with cocaine. Mother's screens presented no further concern, and mother eventually received a medical marijuana card. Turner testified that HCJFS has no substance-abuse concerns with mother.

{¶15} Mother engaged in the DDS assessment, but did not qualify for DDS services. Turner testified that she has concerns about mother's ability to understand what is happening in this case, as mother at times struggles to understand how to do basic things and to retain information. Mother also engaged in parenting classes two times, but was unsuccessfully discharged on both occasions due to her inability to understand the children's needs.

{¶16} Turner testified that while mother had a somewhat stable income from social security disability, she had concerns about mother's ability to manage her finances and live within her means. She also had concerns about mother's inability to obtain stable housing. Mother resided four different places during the pendency of this action. For over a year, mother and maternal grandmother resided in what they referred to as a "cabin." According to Turner, not only was the cabin unsafe for children, but it was generally unhabitable. It had no heat, lacked hot water at times, and the basement was covered from floor to ceiling in black mold and filled with a

layer of trash. During the course of the permanent-custody hearing, mother left the cabin and was temporarily residing with a friend's mother while looking for more permanent housing.

{¶17} According to Turner, mother has never progressed past the facilitated level of visitation, which is the most restricted level. Mother was scheduled to visit with the children every Friday, first at the Family Nurturing Center ("FNC"), and then at a maternal aunt's house. After mother missed several visits, she had to resume visitation at the FNC for a period of time. Turner was concerned about the consistency of mother's visits, in addition to mother's inability to independently care for the children without assistance.

{¶18} Turner testified that Mother was also not consistent in her attendance at the children's medical appointments. While mother blamed transportation issues for many of these missed appointments, Turner testified that she had frequently provided mother with gas cards to use for transportation. When mother still failed to attend the appointments, Turner stopped giving her the gas cards for a period of time because they were not used for the proper purpose. Turner also arranged for transportation to pick mother up on multiple occasions, but mother still had issues with missing appointments. While Turner conceded that many of her clients have had problems with the prearranged transportation not arriving when it was supposed to, she felt that mother had more issues than most. According to Turner, mother was in denial for a period of time about the children's medical needs. One of mother's case-plan goals was to help her understand these needs, which made her attendance at the medical appointments vital.

{¶19} Turner testified that HCJFS was recommending terminating mother's parental rights based on the agency's concern for mother's ability, despite her participation in services, to consistently and safely parent the children without assistance given their significant needs and because of concerns with mother's housing.

{¶20} Turner also testified about father's participation in services and the agency's concerns about father. Father completed a DAF, which recommended that he engage in a psychological assessment, parenting education, and random toxicology screens. Father attended one session of the requested psychological assessment, resulting in the recommendation of additional services, including outpatient drug treatment and therapy. Turner stated that father participated in a drug-treatment program in Indianapolis, where he completed only the in-patient portion of the program. According to Turner, father was recently incarcerated and placed in the River City program, where he participated in drug treatment.

{¶21} Father attended only one drug screen, which was positive. Father did not attend any parenting classes and does not have a stable income. He has not visited A.Y.C. since sometime in 2020 and has never visited E.Y.C. Turner testified that the agency was recommending a termination of father's parental rights due to his failure to participate in case-plan services and demonstrate a significant behavioral change, his failure to visit with the children, and his failure to attend their medical appointments.

{¶22} Mother's therapist at the Talbert House, Donna Vondrell, testified that mother suffers from PTSD and has an intellectual disability that impacts her judgment and cognitive abilities. Vondrell explained that she works with mother on controlling

her anger and her reactions, as well as on making better decisions and processing the traumas that she has experienced. Mother initially missed quite a few appointments when beginning treatment with Vondrell, but has attended therapy regularly since February 2022. Vondrell testified that she has seen growth in mother over the past year, explaining that mother understands more of her purpose in life, including mother's role in taking care of maternal grandmother. She stated that mother is eager to learn and is an active listener and participator in therapy.

{¶23} Lori Hartman, an FNC visitation facilitator, testified about observations that she made when supervising mother's visits with A.Y.C. and E.Y.C. Hartman stated that mother has visitation with the children at a maternal aunt's house for four hours every Friday, and that some combination of maternal grandmother, maternal aunt, maternal uncle, and a cousin were also present at every visit. Mother has never engaged in a visit with the children by herself. With the exception of a three-week span where mother was ill, mother has been consistent with her visitation.

{¶24} Hartman explained that mother is working on multitasking with the children, but often needs to be reminded to follow the children's schedule. Hartman stated that she needed to intervene on a few occasions when mother unintentionally engaged in behavior that could harm the children, including serving A.Y.C. food that was too hot, giving E.Y.C., who cannot eat, a cupcake with a candle in it, and using a bleach wipe when changing a diaper. Hartman has also had to direct mother not to use profanity in front of the children, not to use her cell phone during visits, and to reengage in visits at times. While Hartman testified that mother does not fully understand the children's needs and blames their issues on that the fact that they are in foster care, she stated that mother is open to suggestions, excels at listening to the

9

nurse, and has learned how to use E.Y.C.'s feeding tube. According to Hartman, there has been no recommendation to lower the level of supervision of mother's visits with the children because she has not shown an ability to take care of them on her own without support.

**{¶25}** Mother testified, addressing many of the concerns noted by HCJFS and addressed in her case plan. With respect to her drug usage, she stated that she has not used "meth" in over four years, while acknowledging that there was a short period of time when she abused it. Mother further stated that she has a medical marijuana card to help her with her PTSD. Mother testified that she has a stable income. As for her living situation, mother conceded that the "cabin" where she resided for a majority of the case was not safe for the children and stated that she was looking for alternative living arrangements. Mother also addressed her mental health, stating that she engages in therapy at, and receives medication from, the Talbert House, and that the medication helps her to feel more at peace. She explained that she has consistently taken her medication, with the exception of a period of time where she was delayed in getting a refill. Mother testified that she attended parenting classes at Beech Acres and was told that she had completed the class.

**{¶26}** When discussing her visitation, mother first stated that she has not missed a visit with the children. But she subsequently admitted that she missed a few visits when she was not feeling well because she did not want to get the children sick. Mother stated that although others are present during visitation, she was the predominant caregiver for the children. She acknowledged that it can be difficult to care for E.Y.C. and A.Y.C. at the same time, and stated that she is working on multitasking. Mother also testified about her frustration with the transportation set

up by her caseworker, stating that it did not always arrive when scheduled, causing her to miss appointments. Mother also missed appointments because they conflicted with her care of maternal grandmother and admitted to missing some appointments because she was "slacking." She explained that she often feels out of place at the medical appointments.

{¶27} Mother testified about her knowledge of the children's special needs. She explained that A.Y.C. has cerebral palsy and wears leg braces, that he likes to use sign language but is starting to talk more, that he wears a helmet because he has a habit of banging his head, and that he attends multiple therapy appointments. Mother stated that she is able, on her own, to mix the formula for E.Y.C.'s feeding tube. She also testified that she has five children, but does not have custody of any of them.

{¶28} Father, who was incarcerated at the time, testified via Zoom. He acknowledged that he had not complied with a majority of the services requested by HCJFS. He discussed his long-standing issues with drugs, which resulted in multiple convictions for drug offenses. Father stated that he was engaged in cognitive therapy, parenting classes, and substance-abuse classes while incarcerated. He testified that he could not recall when he had last seen A.Y.C. and that he has never had a visit with E.Y.C. Father testified that he wanted the children to be placed with mother.

{¶29} The magistrate issued a decision on May 18, 2023, granting permanent custody of both A.Y.C. and E.Y.C. to HCJFS. The magistrate found that the children had been in the temporary custody of HCJFS for at least 12 months of a consecutive 22-month period, that the children cannot and should not be placed with either parent, and that father had abandoned the children. He additionally found that a grant of permanent custody was in the children's best interest.

11

{¶30}  Mother filed an objection to the magistrate's decision challenging the weight of the evidence supporting the grant of permanent custody. The trial court found mother's objection to be not well-taken and denied it. The trial court approved and adopted the decision of the magistrate with one modification. It found that only A.Y.C., and not E.Y.C., had been in the custody of HCJFS for 12 or more months of a consecutive 22-month period. But the trial court agreed with the magistrate's findings that the children cannot and should not be placed with either parent in a reasonable time and that a grant of permanent custody was in the best interest of the children, and it committed A.Y.C. and E.Y.C. to the permanent custody of HCJFS.

## II. Permanent Custody

{¶31}  In a single assignment of error, mother argues that the trial court erred as a matter of law in granting HCJFS's motion for permanent custody. She challenges both the sufficiency and the weight of the evidence supporting the trial court's decision.

{¶32}  Pursuant to R.C. 2151.414(B), "a trial court may grant permanent custody if it finds that a grant of permanent custody is in the child's best interest and that one of the conditions in R.C. 2151.414(B)(1) applies." *In re B.J.*, 1st Dist. Hamilton Nos. C-200372 and C-200376, 2021-Ohio-373, ¶ 15. Here, the trial court found that A.Y.C. and E.Y.C. cannot and should not be placed in either parent's care under R.C. 2151.414(B)(1)(a), and that A.Y.C. had been in HCJFS custody for 12 or more months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). It further found that a grant of permanent custody was in the children's best interest.

{¶33}  A juvenile court's grant of permanent custody must be supported by clear and convincing evidence. *Id.* at ¶ 14. Clear and convincing evidence is evidence

that is sufficient to "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Id.*, quoting *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42.

{¶34} In reviewing a challenge to the sufficiency of the evidence supporting a grant of permanent custody, this court "must examine the record and determine if the juvenile court had sufficient evidence before it to satisfy the clear-and-convincing standard." *Id.* We must accept any factual determinations made by the trial court if competent and credible evidence supports them. *In re L Children*, 1st Dist. Hamilton No. C-220601, 2023-Ohio-1346, ¶ 14. When reviewing the manifest weight of the evidence, "we review the record to determine whether the trial court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed." *In re B.J.* at ¶ 14.

### A. Cannot and Should not be Placed with Either Parent/Best-Interest Determination

{¶35} Mother challenges the trial court's findings that A.Y.C. and E.Y.C. cannot and should not be placed in her care within a reasonable time and that a grant of permanent custody was in their best interest.

{¶36} "To determine whether a child cannot or should not be placed with either parent under R.C. 2151.414(B)(1)(a), a juvenile court considers the 16 factors set forth in R.C. 2151.414(E)." *In re K.J.M*, 1st Dist. Hamilton No. C-230163, 2023-Ohio-2457, ¶ 9. In determining whether a grant of permanent custody is the best interest of the children, the court should consider the factors set forth in R.C. 2151.414(D)(1). *Id.* at ¶ 11.

**{¶37}** In support of the finding that the children could not or should not be placed with either parent, the trial court found that "Mother did not demonstrate the necessary behavioral changes and did not make satisfactory progress in the case plan services." This finding corresponds to R.C. 2151.414(E)(1), which provides that:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

The court specifically noted that it was relying on mother's intellectual delays, her housing instability, and mother's inability to competently and independently care for the children, who have severe medical needs. While the trial court also made findings that the children cannot or should be placed with father, those findings are not being challenged on appeal.

**{¶38}** The trial court also considered the factors in R.C. 2151.414(D)(1) to find that a grant of permanent custody was in the children's best interest. R.C. 2151.414(D)(1)(a) concerns the relationship of the children with, as relevant to this

14

appeal, parents, relatives, and foster caregivers. Under this factor, the court noted that the children have regular visitation with mother, but that father has not seen A.Y.C. in months and has never visited with E.Y.C., and that the children are very bonded with each other and their foster family.

{¶39} With respect to R.C. 2151.414(D)(1)(b), which concerns the wishes of the children as expressed directly or through a guardian ad litem, the court noted that the guardian ad litem supported a grant of permanent custody.

{¶40} R.C. 2151.414(D)(1)(c) concerns the custodial history of the child. Under this factor, the court noted that each child had been in agency care since birth, and that A.Y.C. had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period.[1]

{¶41} Under R.C. 2151.414(D)(1)(d), which addresses the children's need for a legally secure placement, the court found that the children were in need of a legally secure permanent placement that could not be achieved without a grant of permanent custody to HCJFS. It noted that no suitable relatives were identified to care for the children and that the children's current caregiver had expressed an interest in adoption.

{¶42} When considering, as required by R.C. 2151.414(D)(1)(e), whether any of the factors in R.C. 2151.414 (E)(7) to (11) applied, the court found that father had abandoned the children.

---

[1] While the magistrate found that both children had been in agency custody for 12 or more months of a 22-month period, the trial court found that this finding was only applicable to A.Y.C., and that E.Y.C. had not been in agency care for the requisite amount of time. As explained in the next section of this opinion, we do not review the merits of the trial court's 12-of-22 finding.

**{¶43}** The trial court's findings that the children cannot and should not be placed with mother within a reasonable time and that a grant of permanent custody is in the children's best interest are supported by clear and convincing evidence. *See In re B.J.,* 1st Dist. Hamilton Nos. C-200372 and C-200376, 2021-Ohio-373, at ¶ 14. At no point during the course of the proceedings did mother have suitable housing where the children could reside. Among other problems, the "cabin" that mother resided at with maternal grandmother for a period of time had no heat and a basement covered in black mold. Mother conceded that this home was not safe for the children. At the close of the hearing, mother herself did not have permanent housing, let alone a place to bring the children, and was residing with a friend's mother while looking for housing. Mother's visitation had to be conducted at maternal aunt's home because of mother's lack of housing.

**{¶44}** The record further demonstrated that mother was unable to care for the children and their severe medical needs without assistance. Mother never progressed past the facilitated level of visitation and never visited the children without the assistance of a family member. Despite mother's best intentions and clear affection for the children, she struggled to care for both A.Y.C. and E.Y.C. at the same time and unintentionally took actions that placed the children at risk of harm, requiring intervention by others. Mother's failure to attend a majority of the children's medical appointments exacerbated her difficulties in caring for them on her own, as she missed vital opportunities to learn about their conditions and how to properly care for them. In fact, mother was twice unsuccessfully discharged from parenting classes due to her inability to understand the children's needs.

{¶45} Both A.Y.C. and E.Y.C. have severe medical needs requiring numerous medical appointments, therapy appointments, and constant care and attention. In addition to attending the necessary appointments, the children's caregiver must work with the children on various skills outside of appointments to help them develop. As such, the children are indisputably in need of a legally secure permanent placement. The record supports the trial court's finding that such placement can only be achieved through a grant of permanent custody. Father has abandoned the children, and despite her participation in some of the offered services, mother has not demonstrated an ability to independently care for the children and manage their needs. Maternal aunt withdrew her petitions for custody, and no other relatives were identified to care for the children. Further, the children are bonded with their foster family, where they have both been placed since birth, and are well cared for in that home.

{¶46} The trial court's findings concerning the children's best interest and whether they cannot or should not be placed with mother were also supported by the manifest weight of the evidence. The court recognized areas where mother succeeded, but it also recognized areas where she struggled, and it ultimately determined that mother was not able to care for the children and that a grant of permanent custody was in the children's best interest. In weighing the evidence presented, the trial court did not lose its way and create a manifest miscarriage of justice. *See In re B.J.*, 1st Dist. Hamilton Nos. C-200372 and C-200376, 2021-Ohio-373, at ¶ 14.

### B. 12-of-22 Finding

{¶47} Mother also challenges the trial court's finding under R.C. 2151.414(B)(1)(d) that A.Y.C. had been in agency custody for 12 or more months of a consecutive 22-month period.

17

{¶48} "A trial court is only required to find the applicability of one factor under R.C. 2151.414(B)(1)." *In re J.R.*, 1st Dist. Hamilton No. C-190342, 2019-Ohio-3500, ¶ 26. Because we have determined that the trial court's finding under R.C. 2151.414(B)(1)(a)—that the children cannot or should not be placed with mother—was supported by clear and convincing evidence, we do not address mother's challenge to the court's finding under R.C. 2151.414(B)(1)(d). *See id.* at ¶ 26 and 29 (declining to address a challenge to the trial court's finding that a child could not or should not be placed with a parent where the court's alternate finding that the child had been in agency custody for 12 or more months of a consecutive 22-month period was supported by clear and convincing evidence).

### C. Mother's Additional Arguments

{¶49} Mother raises several additional arguments not in an assignment of error, but in her conclusory paragraph. In her conclusion, she challenges the trial court's failure to appoint a guardian ad litem on her behalf and alleges several procedural errors in the proceedings below.

{¶50} We decline to address these arguments, as they were not raised in an assignment of error for our review. App.R. 12(A)(1)(b) provides that an appellate court shall "[d]etermine the appeal on its merits on the assignments of error set forth in the briefs." This rule establishes that "[t]he role of an appellate court is to 'rule[] on assignments of error, not mere arguments.'" *State v. Lear*, 1st Dist. Hamilton No. C-220485, 2023-Ohio-3442, ¶ 17, quoting *Mun. Tax Invest. LLC v. Northup Reinhardt Corp.*, 10th Dist. Franklin No. 19-AP-26, 2019-Ohio-4867, ¶ 24, quoting *Huntington Natl. Bank v. Burda*, 10th Dist. Franklin No. 08AP-658, 2009-Ohio-1752, ¶ 21.

{¶51} Mother's sole assignment of error challenged the sufficiency and the weight of the evidence supporting the trial court's grant of permanent custody. Because mother has raised no assignment of error concerning the trial court's failure to appoint a guardian ad litem or the alleged procedural errors, we decline to consider these arguments. *See Lear* at ¶ 17.

### III. Conclusion

{¶52} Having found that the trial court did not err in granting permanent custody of A.Y.C. and E.Y.C. to HCJFS, we overrule mother's assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**WINKLER** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.