# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: T.B. AND G.B.  :          APPEAL NO.   C-250161
                                 TRIAL NO.    F/21/298 X
                      :

                      :
                                 *JUDGMENT ENTRY*
                      :


This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 6/25/2025 per order of the court.**


**By:**_____
          **Administrative Judge**

[Cite as *In re T.B.*, 2025-Ohio-2212.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: T.B. AND G.B.      :      APPEAL NO.   C-250161

                                        TRIAL NO.    F/21/298 X

                                 :

                                 :                *O P I N I O N*

                                 :

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 25, 2025

*Christopher P. Kapsal*, for Appellant Mother,

*Connie M. Pillich,* Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Shawn Moore*, Assistant Public Defender, Appellee Guardian ad Litem for T.B. and G.B.,

*Jon R. Sinclair*, Appellee Guardian ad Litem for Mother,

*Dain T. Monroe*, for Father.

CROUSE, **Presiding Judge.**

**{¶1}** Appellant Mother appeals from the trial court's grant of permanent custody of her children T.B. and G.B. to appellee the Hamilton County Department of Job and Family Services ("HCJFS").

**{¶2}** In a single assignment of error, Mother argues that the trial court's determination that a grant of permanent custody was in the children's best interest was not supported by sufficient evidence and was against the manifest weight of the evidence. We find Mother's argument to be without merit and affirm the trial court's judgment.

## I. *Factual and Procedural History*

**{¶3}** Mother and Father K. are the parents of T.B. Mother and Father B. are the parents of G.B.

**{¶4}** This case originated on March 5, 2021, when HCJFS sought an ex parte emergency order of custody for both children after Mother obtained an ex parte civil protection order against Father B. A juvenile court magistrate granted the order, and the children were placed together with a paternal grandmother under a safety plan.

**{¶5}** On March 26, 2021, HCJFS filed a complaint for temporary custody, a motion for an interim order of temporary custody, and an affidavit supporting the motion. Collectively, these documents alleged that T.B. and G.B. were neglected and dependent; that Father K. had no regular contact with T.B.; that Mother dismissed the ex parte civil protection order that she had obtained against Father B.; that the protection order was obtained based on Mother's report that Father B. had acted in a violent manner in front of the children on a number of occasions, had knocked Mother to the ground, and had destroyed Mother's phone and furniture; and that both Mother and Father B. reported that they were no longer willing to maintain the safety plan.

That same day, the trial court granted the motion for an interim order of temporary custody.

**{¶6}** On April 29, 2021, the initial case plan for the family was filed. The stated case-plan goal was reunification, and the plan set forth various services that Mother and Father B. needed to engage in to reach that goal. The case plan provided that Mother and Father B. would participate in mental-health management services and individual counseling through the Health Resource Center ("HRC") and that they would engage in a Family Access to Integrated Recovery ("FAIR") assessment and a domestic-violence assessment with the YWCA and follow any treatment recommendations from both assessments. Mother and Father B. were also expected to maintain safe and stable housing. The case plan further stated that T.B. and G.B. had been placed together in a foster home.

**{¶7}** On October 21, 2021, HCJFS filed an amended complaint for temporary custody. The amended complaint stated that Mother had participated in a diagnostic assessment through FAIR and was diagnosed with Bipolar 1 disorder and Attention-Deficit/Hyperactivity Disorder ("ADHD"). Father B. also participated in a diagnostic assessment and was diagnosed with ADHD, unspecified Neurodevelopmental Disorder, and Unspecified Bipolar and Related Disorder. The complaint further stated HCJFS had concerns regarding Mother's mental health because of erratic behaviors that she had exhibited and allegations that she had made, including (1) filing for divorce from Father B. on July 23, 2021, and then dismissing that action approximately two months later, (2) alleging that Father B. had been poisoning her and the children, but then recanting that allegation and alleging that paternal grandmother was poisoning the family, and (3) denying HCJFS access to her home so that it could be assessed for safety and appropriateness.

**{¶8}** The amended complaint also stated that Father B. was charged with domestic violence against Mother on May 16, 2021, based on an allegation that he grabbed Mother, threw her to the floor, ripped out her hair, and kicked her legs. It further alleged that a bond revocation was issued for Father B. on October 6, 2021, alleging that he violated the terms and conditions of his electronic-monitoring supervision by cutting off his tracker and absconding.

**{¶9}** On February 14, 2022, the magistrate issued a decision adjudicating T.B. and G.B. dependent. The allegation of neglect was dismissed. The interim custody of the children was terminated, and they were committed to the temporary custody of HCJFS. Given the length of time that had passed since the children were first placed in agency custody, the magistrate also granted the first extension of temporary custody in this same decision.

**{¶10}** On July 25, 2022, HCJFS filed a motion to extend temporary custody. That motion was granted on August 24, 2022.

**{¶11}** On February 23, 2023, HCJFS filed a motion to modify temporary custody to permanent custody. The motion alleged that the children had been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period and that a grant of permanent custody was in the children's best interest. In accordance with *In re Williams*, 2004-Ohio-1500, independent counsel was appointed for the children on April 6, 2023.

### A. Permanent-Custody Trial

**{¶12}** A two-day trial was held on the motion for permanent custody on March 13, 2024, and October 11, 2024. HCJFS presented testimony from three caseworkers who had responsibility for the family while this action was pending. Desiree Dixon testified that she was the family's caseworker from April of 2021 until January of 2023.

Dixon explained that the domestic violence between Father B. and Mother initially brought the family to the agency's attention, and that, upon further assessment, the mental health of the parents also became a concern.

**{¶13}** According to Dixon, Father K. had no involvement with T.B. while she had case responsibility. With respect to Father B., Dixon testified that he and Mother were married, but that they separated and got back together multiple times. Mother also obtained and then dismissed several protection orders against Father B.

**{¶14}** Dixon's testimony addressed the domestic violence between Mother and Father B. She stated that Mother initially believed that Father B.'s violent episodes were triggered by an interaction between various medications. However, despite a change to Father B.'s medication, domestic violence remained present in the parties' relationship. Dixon testified about an incident that Mother had reported in which Father B. punched Mother in the face and tore off her clothing during a disagreement. Dixon testified that Father B.'s unwillingness to discuss these incidents displayed a minimization of them and the frequency with which they were occurring.

**{¶15}** Dixon discussed the case-plan services offered to Mother and Father B. She explained that Father B. was asked to engage in a Diagnostic Assessment of Functioning ("DAF") through FAIR, to engage in a domestic-violence assessment, and to maintain stable housing and employment. Father B. participated in the DAF, which recommended that he engage in individual counseling, follow up on pharmaceutical management, and undergo a domestic-violence assessment. Dixon received confirmation that Father B. had begun counseling at the HRC, but she had a difficult time both maintaining contact with Father B. and obtaining consent for his counselor to speak with her. As a result, she never received any documentation that Father B. successfully completed this case-plan requirement. Dixon testified that Father B.

completed the domestic-violence assessment, but that when her case responsibility ended, she still had concerns about domestic violence with respect to Father B.

{¶16} Dixon testified that she also had concerns about the stability of Father B.'s housing. She explained that he resided with Mother when the children entered agency care and that he lived with his mother (i.e., G.B.'s paternal grandmother) when not living with Mother. With respect to Father B.'s visitation with the children, Dixon testified that his visits were initially combined with Mother's, but that the parents began to visit separately after Mother obtained a protection order against Father B. While Father B. visited consistently on his own for approximately one month, his attendance level fell off, and by the end of Dixon's case responsibility, Father B. no longer engaged in visitation.

{¶17} Dixon testified that she found it difficult to engage with Father B. She had to consistently repeat herself when speaking with him and stated that he would often forget the topic at hand. Dixon testified that Father B. was unable to convey any strategies or coping skills that he had learned in counseling, and that she had concerns with Father B.'s erratic behavior. According to Dixon, Father B. was very aggressive in his tone during many conversations and made indirect threats regarding the placement of his children in agency custody. These included statements that he would "find you" and that "you're going to pay for this." At times, it seemed to Dixon that Father B. slurred his words and was under the influence.

{¶18} Dixon testified that Mother was asked to complete a DAF with FAIR, complete a domestic-violence assessment with the YWCA, continue with individual counseling, manage her medication, engage in visitation, and maintain stable housing and income. Mother completed a DAF in 2021 and then another in 2023. Dixon stated that Mother engaged in individual counseling at HRC, but that she never had contact

7

with Mother's counselor.

**{¶19}** Dixon testified that Mother completed the domestic-violence assessment but provided little information about the domestic-violence incidents with Father B. Dixon explained that one of her main concerns with Mother was the obtaining, and then subsequent dismissal, of protection orders against Father B. She felt that Mother failed to take appropriate steps to address the domestic violence.

**{¶20}** With respect to visitation, Dixon explained that Mother remained on the highest level of supervised visitation at the Family Nurturing Center ("FNC") while Dixon had case responsibility. She acknowledged that FNC records, which were admitted at trial, generally provided that Mother did well in visitation and attended to her children's needs. But Dixon's testimony established that in January of 2022, Mother's visitation was "disrupted" due to an incident that occurred during a visit. FNC records indicated that on the January 5, 2022 visit, Mother arrived and told the staff that she would not be leaving without her children. The visit was cancelled, and a meeting was scheduled to discuss boundaries and expectations of visitation. However, before that meeting could occur, Mother was involved in a serious car accident. Mother was in a temporary coma, suffered serious injury, and remained hospitalized for approximately a month. As a result of the accident, Mother was taken off the visitation schedule at the FNC. Mother initially requested to delay the resumption of visitation after her accident because she was not yet ready to visit and did not want the children to be disturbed by her appearance. Dixon stated that Mother was issued a referral for visitation to be resumed at a new facility, JusticeWorks, approximately three months after her accident. However, Mother had not yet resumed visits at the time Dixon's case responsibility ended in January of 2023.

**{¶21}** Dixon testified that Mother had consistent housing during the time that

she had case responsibility. She also stated that Mother had a consistent income from either Social Security or Disability, and that Mother temporarily worked at Home Depot.

**{¶22}** Dixon testified that she had concerns about Mother's mental health. She described erratic and aggressive phone calls that she received from Mother at all times of the night. In these calls, Mother stated that "everybody would pay" and called Dixon names. Dixon also received calls from the FNC regarding their concerns about Mother. Dixon testified that Mother had alleged that Father B. drugged her and the children and insisted that HCJFS drug test the children. The agency, however, did not feel that testing was necessary because the children had not been in the physical presence of Father B. during the time that the drugging was alleged to have occurred.

**{¶23}** Dixon further testified that Mother was aggressive during the virtual semiannual administrative-review meetings. Mother would interrupt other speakers, and at times had to be muted because she continued to speak out of turn and make sarcastic comments.

**{¶24}** Dixon stated that T.B. and G.B. were placed in the same foster home, and that their caregiver was willing to provide permanency for the children if the agency was granted permanent custody. According to Dixon, T.B. received school-based counseling, and G.B. was enrolled in a therapeutic school where he could receive on-site counseling and medication management. Dixon explained that G.B. showed signs of aggression and impulsivity and would hit other children and school staff. She stated that Mother was not in agreement with medicating G.B. and attributed his behavior to the fact that he had been removed from home.

**{¶25}** The next HCJFS caseworker to testify was Leah McKinney, who had case responsibility from approximately September of 2023 to June of 2024. McKinney

stated that Father K. and Father B. had no involvement with the children and provided no financial support during her period of case responsibility. Unlike the fathers, McKinney was able to maintain contact with Mother.

**{¶26}** McKinney's testimony established that Mother visited the children at JusticeWorks, but that the visits were stopped because of hostile and aggressive behavior exhibited by Mother, who had sent "very vulgar," "nasty," and "demeaning" text messages to the visitation facilitator. JusticeWorks employees wanted to meet with Mother to discuss their rules and expectations, but when Mother refused to meet, her visits were terminated.

**{¶27}** McKinney testified that Mother did not visit the children from September of 2023 until visitation resumed at a third location, Beech Acres, early in 2024. Mother visited with the children until March of 2024, when visitation was terminated after she missed multiple visits. During the period in which Mother was not actively visiting, foster mother allowed telephone communication between Mother and the children.

**{¶28}** McKinney testified that she had one home visit with Mother, during which Mother initially presented as calm and upbeat. However, she quickly shifted in behavior and tone when McKinney asked her about reengaging in visitation with the children and reminded Mother to be respectful of the professionals and to watch her tone and interaction with the children. Mother shouted at McKinney that "everyone" was lying and that she had never behaved inappropriately during visits. McKinney was so uncomfortable that she terminated the home visit.

**{¶29}** With respect to Mother's engagement in services during McKinney's period of case responsibility, McKinney testified that she was not able to obtain a release of information from Mother and was unable to speak to Mother's therapist

about her progress. McKinney stated that Mother completed an initial assessment at the YWCA and was referred for a second assessment, which she completed in December of 2023. McKinney received documentation that Mother was referred to Women Helping Women and completed that program. McKinney testified that this sufficiently satisfied the case-plan requirement that Mother complete a domestic-violence assessment and follow any recommendations.

{¶30} McKinney testified that the instability of Mother's mental health and her inconsistent visitation spoke to Mother's commitment and ability to consistently meet the children's needs. McKinney explained that Mother engaged in "quickly escalating agitated behaviors" when a statement was made that she did not agree with.

{¶31} Stephanie Bishop, the children's caseworker at the time of the permanent-custody trial, testified that she had no contact with Father K. or Father B. after inheriting case responsibility, and that neither father had engaged in case-plan services. Bishop stated that she had difficulty contacting Mother, despite repeated attempts. Mother did not respond to Bishop at all in June of 2024. But in July of 2024, Mother responded to a text message that Bishop had sent and told Bishop that HCJFS was racist because it continued to give Mother black caseworkers. Mother told Bishop that she did not plan on meeting with her.

{¶32} Bishop testified that she attended one of Mother's scheduled visits with the children at Beech Acres in July of 2024 and did not observe anything that caused her concern. At the end of the visit, she spoke with Mother about obtaining Mother's approval to give G.B. a certain medication. According to Bishop, Mother was open to meeting with G.B.'s psychiatrist so that the doctor could explain to Mother why the medication was necessary.

{¶33} Bishop explained that she was unable to assess Mother's progress in

11

case-plan services because Mother did not respond to any of Bishop's attempts to contact her in August or September of 2024. In October of 2024, Mother told Bishop that she was in the process of finding placement in a shelter.

**{¶34}** Bishop observed the children in their foster placement several times and testified that both children were bonded with their caregiver and engaged in open and positive communication in the foster home. Bishop explained that T.B. demonstrated aggressive behaviors in school, and that a meeting was scheduled to determine what additional supports for T.B. should be implemented. Bishop further testified that G.B. was on an Individualized Education Plan to address his behavior, and that he engaged in therapy. She explained that HCJFS attempted to obtain Mother's approval to increase G.B.'s medication to assist with his mood stabilization. Bishop testified that a grant of permanent custody was in the children's best interest.

**{¶35}** Shawn Moore, the children's current guardian ad litem, also testified. Moore testified that he was unable to investigate Mother's physical and mental health because she had not executed a valid release of information. Moore stated that Mother's mood and tone were inconsistent during their interactions. She usually started out behaving pleasantly but would turn aggressive. He specifically stated that Mother did not like to take feedback and often became "elevated" when asked about "behavioral change."

**{¶36}** Moore described an incident that had recently occurred in which he reached out to Mother to set up a meeting for her with G.B.'s medical team to discuss medication changes. Mother accused Moore of setting her up and kidnapping and drugging her child. She called him profane names and spoke in a vulgar manner.

**{¶37}** Moore acknowledged that T.B. and G.B. desired to be returned to their Mother's care but testified that he believed a grant of permanent custody was in the

children's best interest.

**{¶38}** Mother testified in detail about her relationship with Father B. She explained that she initially attributed Father B.'s violent behavior to an issue with medication, but that she later came to believe "it's just the way he is." Mother explained that Father B. had acted violently towards her on multiple occasions, including ripping her hair out and breaking her nose. This latter incident required her to have surgery. According to Mother, Father B. had been convicted of domestic violence and of two protection-order violations. She stated that she currently had two active protection orders against Father B., one in family court and one in criminal court.

**{¶39}** Mother acknowledged that she had previously filed and then dismissed a petition for divorce. But she testified that she initiated a second divorce action in April of 2023 and that she and Father B. were now divorced. Mother stated that she had not been involved with Father B. since July of 2022.

**{¶40}** With respect to her participation in case-plan services, Mother testified that she had engaged in two domestic-violence assessments and then completed the Women Helping Women program. Mother engaged in the FAIR assessment and a psychological assessment. When asked if she had been given any diagnoses, Mother responded, "He said all kinds of crazy things about me that are not true." Mother stated that she engaged in individual counseling at the HRC. When asked if she had ever signed or revoked a release of information allowing her caseworker to speak with her counselor, Mother stated that she had revoked a previous release of information but had recently executed a new release. But the release was limited to allowing her counselor to discuss the fact that Mother received treatment and took medication.

**{¶41}** Mother's testimony also addressed the gaps in her treatment. She explained that she was hospitalized for a period following her January 2022 car

accident. She further stated that she was convicted of assault for fighting with Father B.'s cousin and was incarcerated for 78 days sometime between October of 2022 and January of 2023. Mother testified that she was also briefly incarcerated in Warren County in June of 2022 for obstruction and unauthorized use.

**{¶42}** With respect to housing, Mother stated that she had been evicted from her home in August or September of 2024 and that she was currently residing in a YWCA shelter for women and children of domestic violence. Mother described her housing history before this eviction. She testified that she first resided in a home on Vine Street and then moved to a home on Republic Street. However, her landlord evicted her from the Republic Street property in July of 2022 after the episode resulting in Mother's assault conviction, which occurred on that property. Mother then moved back into the Vine Street home until her eviction in September of 2024. She briefly stayed with a friend before moving into the shelter.

**{¶43}** With respect to income and employment, Mother stated that she was not currently employed, but that she received approximately $1,000 each month in Social Security income. She testified that she had sufficient income to support the children if they were returned to her care.

**{¶44}** Mother's testimony also addressed visitation. She stated that she visited the children at the FNC until her car accident in January 2022, and that she was upset that her visitation never progressed to allow for home visits. With respect to the lengthy gap in visitation that occurred following her car accident, Mother stated that she had told both her caseworker and her attorneys that she wanted to resume visitation, but that no action was taken. Mother was very critical of the JusticeWorks' facility, stating that it was dirty and caused both her and G.B. to get sick. She also explained that she became frustrated after a supervisor intervened on one occasion

and stopped her from attempting to parent G.B. when he exhibited abusive and destructive behavior. Mother denied sending threatening texts to any of the JusticeWorks' employees.

**{¶45}** Mother explained that her visitation ultimately resumed at Beech Acres, but that it was cancelled when she missed visits due to emergency surgery for a bowel obstruction. Visitation was later resumed at Beech Acres, but Mother stopped visiting when she felt that she was dealing with too many other issues in her life. Mother stated that she currently keeps up with her children on video calls.

**{¶46}** Mother admitted that she had an issue with alcohol. She testified that she initially stopped drinking after giving birth to T.B., but that she began drinking again after her children were removed from her care. Mother stated that she and her counselor were currently working on substance-abuse treatment. Mother acknowledged that her counselor had recommended a residential detoxification program, but she stated that she was currently doing well and living in a shelter where she is "not allowed to do anything" so "detox would probably be a little extravagant."

**{¶47}** Mother also testified about the children's behavioral issues. She stated that she was given minimal information regarding her children's health, but that she was aware that T.B. had emotional outbursts. Mother testified that G.B. was diagnosed with a speech-language delay and global-development delay, and she explained that she did not believe in approving medication for G.B. without speaking to his doctor.

**{¶48}** Mother addressed McKinney's testimony about her home visit. She denied shouting at McKinney, and she stated that McKinney had been very snide during the visit and that McKinney's abrupt departure from her home was strange. Mother also addressed Moore's testimony that she had accused him of kidnapping and drugging her child. She clarified that her comments conveyed that she felt like her

children had been kidnapped, as well as her belief that the caseworkers would medicate her children however they desired, despite Mother's concerns. Mother further denied making vulgar statements to Moore. She testified that Moore had purposely tried to flare up her anger by questioning her about behavioral changes. Mother explained that she was tired of those types of comments. She testified that she had undergone a behavioral change and was now able to respond to situations in a calmer manner and handle her anger better.

{¶49} Mother presented testimony from her counselor, Mary Lynne Calkins. Calkins testified that she was a clinical social worker and an outpatient therapist and supervisor at HRC. Other than a few gaps in Mother's therapy due to her car accident and periods of incarceration, Calkins had treated Mother since 2018. Calkins stated that Mother's current diagnoses are borderline personality disorder, ADHD, post-traumatic stress disorder, and alcohol-use disorder. She explained that Mother had initially been given a bipolar diagnosis, but that it was later determined Mother's symptoms were more aligned with a diagnosis of borderline personality disorder.

{¶50} Calkins testified that someone suffering from borderline personality disorder presents with difficulty regulating emotions, difficulty getting along with others, relationship issues, and high distress levels. Calkins stated that she treats Mother's borderline personality disorder with dialectal behavioral therapy, which focuses on distress tolerance, interpersonal effectiveness, mindfulness, and emotional regulation, including anger management. Specifically, she and Mother work on tolerating the distress caused by Mother's homelessness and the emotion connected to her car accident. Calkins explained that therapy for someone diagnosed with borderline personality disorder is typically a 15-year course, but that she has seen progress in Mother's ability to manage the disorder.

**{¶51}** Calkins testified that more recently she and Mother have been working on harm reduction related to Mother's alcohol-use disorder. She stated that Mother has been "up and down" in her sobriety, and that she most recently relapsed when she lost her housing. Calkins recommended that Mother enter a residential detoxification program, and she stated that Mother wavers on whether she wants to stop drinking completely.

**{¶52}** Father B. testified that he and Mother were divorced and have no contact. He stated that he stopped attending therapy at HRC due to his incarceration, but that he was currently trying to reengage and was on a wait list. Father B. discussed his history of incarceration during the pendency of this case, stating that he was incarcerated for domestic-violence charges against Mother, protection-order violations, and obstruction. He acknowledged that he has housing instability, testifying that he has experienced periods of homelessness, but has "a place I'm staying at now."

**{¶53}** Father B. testified that he has not seen the children since 2021 and that he has not provided any financial support for them in that time period.

### B. Permanent Custody is Granted

**{¶54}** Approximately one month after the permanent-custody trial concluded, the magistrate issued a decision granting permanent custody of T.B. and G.B. to HCJFS. The magistrate found that the children had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period and that a grant of permanent custody was in the children's best interest.

**{¶55}** Mother filed an objection to the magistrate's decision, arguing that it was against the manifest weight of the evidence. In her objection, Mother specifically challenged several of the magistrate's findings of fact and conclusions of law. The

children's *In re Williams* attorney also filed an objection arguing that the magistrate's decision granting permanent custody was not supported by clear and convincing evidence, was against the manifest weight of the evidence, and was not in the children's best interest.

{¶56} Both HCJFS and the children's guardian ad litem filed a response to the objections, asking the court to overrule the objections and uphold the magistrate's grant of permanent custody. Mother's guardian ad litem filed a response advocating against a return of the children to Mother's care. The guardian stated his opinion that Mother had not resolved her serious mental-health issues and that she continued to present a safety concern for the children. Father B. filed a statement indicating his support for a remand of custody of the children to Mother.

{¶57} The trial court issued a decision overruling the objections and adopting the magistrate's decision granting permanent custody as the judgment of the court. Mother now appeals.

## II.   *Sufficiency and Weight of Best-Interest Determination*

{¶58}  In a single assignment of error, Mother argues that the trial court erred in finding that a grant of permanent custody was in the best interest of the children when that finding was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶59} An award of permanent custody is governed by R.C. 2151.414. That statute was amended effective April 3, 2023. *See* 2023 Am.Sub.H.B. No. 281. While the amendment only implemented minor changes, we must apply the version of the statute that was in effect at the time that HCJFS moved for permanent custody. *See In re C.W.*, 2024-Ohio-4987, ¶ 43 (1st Dist.). We accordingly apply the former version of the statute that was in effect on February 23, 2023.

{¶60} Former R.C. 2151.414(B) provided that a trial court may grant permanent custody of a child to a children services agency if the court determined, by clear and convincing evidence, that a grant of permanent custody was in the best interest of the child and that one of the five conditions set forth in R.C. 2151.414(B)(1) applied. *See also In re C.W.* at ¶ 44. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶61} In reviewing a challenge to the sufficiency of the evidence supporting a grant of permanent custody, the role of this court is to independently review the evidence to determine if the trial court's decision is supported by clear and convincing evidence. *In re S.D.*, 2020-Ohio-3379, ¶ 12 (1st Dist.*)*; *In re A.Y.C.*, 2023-Ohio-4494, ¶ 34 (1st Dist.). The evidence supporting each permanent-custody finding must satisfy this clear-and-convincing standard. *In re S.D.* at ¶ 12. In our review, we must accept factual determinations made by the trial court if they are supported by competent and credible evidence. *In re A.Y.C.* at ¶ 34.

{¶62} In contrast, when reviewing a challenge to the manifest weight of the evidence, "'we review the record to determine whether the trial court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed.'" *Id.*, quoting *In re B.J.,* 2021-Ohio-373, ¶ 14 (1st Dist.).

{¶63} In the case at bar, the trial court granted permanent custody after finding that a grant of permanent custody was in the children's best interest and that,

pursuant to former R.C. 2151.414(B)(1)(d), the children had been in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period.

**{¶64}** Mother does not challenge the trial court's determination under former R.C. 2151.414(B)(1)(d), and she concedes that the children had been in agency custody for the requisite time. Rather, her challenge focuses solely on the trial court's determination that a grant of permanent custody was in the children's best interest.

**{¶65}** Former R.C. 2151.414(D) set forth various factors for the trial court to consider when making a best-interest determination. Former R.C. 2151.414(D)(1)(a) required the trial court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, [and] foster caregivers." With respect to this factor, the trial court found that Mother was bonded to both T.B. and G.B., who were also closely bonded to each other. It noted that Mother took great pride in the children and was invested in their interests.

**{¶66}** As for the children's fathers, the court found that Father K. had no bond with T.B. and had been absent from her life for the entirety of these proceedings. It further found that Father B. had no bond with G.B., had been absent from his life for a vast majority of the case, had not engaged in any visitation or had contact with G.B. since 2021, and was currently prohibited by a protection order from having contact with G.B. The trial court additionally noted that the children were closely bonded to their foster family, who wished to adopt them if possible.

**{¶67}** Former R.C. 2151.414(D)(1)(b) required the trial court to consider the children's wishes, either expressed by them directly or by their guardian ad litem. The trial court found that the children's *In re Williams* counsel was not convinced that the children were mature enough to understand the concept of permanency, but she believed that they wished to maintain a relationship with Mother or return to her care.

20

**{¶68}** Former R.C. 2151.414(D)(1)(c) required the trial court to consider the children's custodial history. When considering this factor, the trial court found that the children had been in the temporary custody of HCJFS for well over 12 or more months of a consecutive 22-month period. It specifically noted that T.B. had been out of Mother's care for 33 percent of her life and G.B. had been out of Mother's care for 46 percent of his life.

**{¶69}** Former R.C. 2151.414(D)(1)(d) required the trial court to consider the children's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." The trial court made extensive findings when considering this factor.[1] It found that Mother had engaged in various services, including completing a DAF, a domestic-violence assessment, and a psychological evaluation. The court found that Mother also engaged in individual therapy at the HRC, but that HCJFS encountered obstacles in receiving any information regarding Mother's progress in therapy. Related to this point, the court noted that Mother had rescinded a release of information and then executed a limited release that only allowed her providers to share the fact that she was engaged in therapy and took medications. The most recent release prohibited disclosure of any details concerning the nature of treatment and progress made.

**{¶70}** The trial court further found that there were concerns with Mother's mental health, including significant diagnoses and erratic behaviors noted by multiple professionals involved in this case. It specifically noted that Mother's behavior quickly escalated and that she became aggressive and agitated when presented with a conversation that she did not want to have or a topic that she did not want to discuss.

---

[1] We confine our discussion to the trial court's findings regarding Mother, as neither Father B. nor Father K. challenge the termination of their parental rights.

**{¶71}** The trial court found that despite lengthy engagement in therapeutic services, Mother had not committed to sobriety and that her behavior remained uncontrolled and explosive. In support of this finding, the court referenced testimony regarding the threatening voicemails that Mother left her caseworkers, the concerns noted by the visitation facilitators regarding Mother's behavior at visitation, Mother's aggressive and interrupting behavior during the semiannual administrative reviews, and Mother's behavior during McKinney's home visit. The court also referenced Mother's actions that led others to question her grasp on reality, including her allegations that Father B. drugged her and the children and that professionals in this case were kidnapping her children.

**{¶72}** The trial court stated that it found Mother's insight into the nature of domestic violence to be concerning. In support, it noted that while Mother appeared genuine in her statements that she did not wish to be with Father B., she nonetheless continued to voluntarily reach out to him after they were divorced and while she had a valid protection order. The court further found that while Mother generally had a place to go, her housing remained unstable over the course of the case.

**{¶73}** With respect to visitation, the court found that Mother was not consistent in visiting with the children and that she exhibited inappropriate behavior during visitation on numerous occasions. It further found that Mother's parenting abilities were insufficient to properly care for the children, citing Mother's inability to manage her emotional responses and FNC records indicating that Mother's actions caused the children emotional distress. The court also referenced the behavioral-health needs of the children and their developmental delays that required additional support from a caregiver.

**{¶74}** Former R.C. 2151.414(D)(1)(e) required the trial court to consider

whether any of the factors in former R.C. 2151.414(E)(7) to (11) applied. With respect to this factor, the trial court found that former R.C. 2151.414(E)(1) applied to both fathers and that they had abandoned their children.

{¶75} Following our review of the record, we hold that the trial court's best-interest determination and its findings under former R.C. 2151.414(D)(1) were supported by clear and convincing evidence.

{¶76} With respect to the trial court's findings under former R.C. 2151.414(D)(1)(a), the record clearly demonstrated that the children were bonded with Mother and that Mother loved her children and wanted them returned to her care. The court's finding that the foster family wished to adopt the children was also supported by the record. While Mother argues that the foster family's wish to adopt the children does not outweigh her right to have the children returned to her care, the trial court never found to the contrary. The court was required by this factor to consider the nature of the children's relationship with their parents and their foster caregivers, and the court did so.

{¶77} With respect to the trial court's findings under former R.C. 2151.414(D)(1)(c), Mother specifically argues that the trial court did not address the time that the children spent in her care before they entered agency custody. Mother's argument is not supported by the record. When considering this factor, the trial court noted that T.B. had been in agency care for 33 percent of her life and that G.B. had been in agency care for 46 percent of his life. The inverse of this calculation is true, and the trial court was therefore aware that T.B. spent approximately 67 percent of her life, and that G.B. spent 54 percent of his, in Mother's care.

{¶78} Mother last challenges the trial court's determination under R.C. 2151.414(D)(1)(d) that a legally secure placement for the children could not be

achieved without a grant of permanent custody. She argues that she complied with her case-plan requirements and remedied the condition that caused the children to be removed from her home.

**{¶79}** Mother did make admirable efforts and comply with some of her case-plan goals. She participated in a domestic-violence assessment, completed the Women Helping Women Program, and divorced Father B. While Mother seemed to satisfactorily address HCJFS's concerns with domestic violence, other concerns remained present. Further, "[a] parent's compliance with the case plan does not preclude a trial court from awarding custody to a children-services agency, as long as it is in the child's best interest." *In re A.F.*, 2020-Ohio-5069, ¶ 26 (1st Dist.).

**{¶80}** Despite participating in counseling, Mother's mental health remained unstable and her behavior volatile. Mother exhibited behaviors that caused those involved in her case to question her grasp on reality. She behaved erratically towards caseworkers and visitation facilitators, including by leaving them threatening messages and calling them vulgar names. Mother also refused to execute a release of information that would allow HCJFS to determine if she was progressing in the therapy that she attended.

**{¶81}** In addition to failing to remedy the agency's concerns with her mental health, Mother continued to struggle with alcohol abuse and lacked stable housing. She was residing in a domestic-violence shelter at the time of the permanent-custody hearing. And while not as troubling as Mother's mental-health issues, the record establishes that her visitation with the children was inconsistent. Mother understandably was unable to attend visits after her hospitalization resulting from the car accident and after her emergency bowel surgery. But she failed to resume visitation for over a year after the car accident. And once visitation resumed, it was later stopped

because of hostile and aggressive behavior exhibited by Mother. Mother's testimony established that after visitation was again resumed, she, of her own volition, ceased visiting with the children because she was struggling to handle all of the other issues in her life.

**{¶82}** We accordingly hold that the trial court's findings in support of the grant of permanent custody were supported by clear and convincing evidence, *see In re S.D.,* 2020-Ohio-3379, at ¶ 12 (1st Dist.); *In re A.Y.C.,* 2023-Ohio-4494, at ¶ 34 (1st Dist.), and that its judgment was not against the manifest weight of the evidence. Given Mother's erratic and aggressive behaviors towards caseworkers and others involved in this case, her struggles with alcohol, her unstable housing, and her inconsistent visitation with the children, we cannot hold that this was the rare case in which the trial court lost its way and committed such a manifest miscarriage of justice in granting permanent custody of T.B. and G.B. to HCJFS that its judgment must be reversed. *See In re A.Y.C.* at ¶ 34.

**{¶83}** Mother's assignment of error is overruled, and the trial court's judgment is affirmed.

Judgment affirmed.

**NESTOR** and **MOORE, JJ.,** concur.